FILED
2015 Jan-15 PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | |
|---|---|
| STEPHANIE HICKS, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § Case No. 7:13-CV-02063-TMP |
| | § |
| CITY OF TUSCALOOSA, | § |
| | § |
| Defendant. | § |

## DEFENDANT'S REPLY MEMORANDUM

Comes now Defendant City of Tuscaloosa and replies to the Plaintiff's Brief in Opposition to Motion for Summary Judgment. (Doc. 21).

## I

## REPLY TO PLAINTIFF'S FACTS

Because the Plaintiff did not state her facts paragraph-by-paragraph, the City's response is included in its argument below.

## II

## COUNT I – FMLA

### A. Interference - Restoration

The Plaintiff limits her interference claim to a failure to restore. She concedes that she received the requisite twelve weeks of FMLA leave. (Doc. 21, p. 54). In fact,

1

she was off work (and paid) from August 20, 2012 to November 26, 2012, (13 weeks and 1 day). (Hicks Depo., 218, 220-221, 223, 230-233, 327, 353-355). In other words, it is undisputed that she failed to return to work at the end of the twelve week period. As a consequence, she was not entitled to be restored to her position as agent on the Narcotics Task Force. *Dixon v. Public Health Trust of Dade County,* 567 Fed. Appx. 822 (11th Cir., 2014). The Plaintiff was also not entitled to reinstatement because she was unable to perform her job. *Grace v. Adtran, Inc.*, 470 Fed. Appx. 812, 815-16 (11th Cir., 2012). She testified that she was incapacitated from August 23, 2012, through February or March 2013. (Hicks Depo., 24, 25, 227-233, 354-355, 439; Doc. 21, p. 46, paras. 43-44, 75).

Even if the Plaintiff had been entitled to restoration, she was, in fact, restored to the position she held when her leave commenced as required by 29 U.S.C. § 2614(a)(1)(A). As she admitted in her deposition, her pre-leave duties included the same responsibilities as other agents. She was to also handle pharmaceuticals but only on a *temporary* basis. (Hicks Depo., 75-80, 98-99). When she became pregnant, she sought and reached an arrangement with the then Task Force commander, Captain Snyder, to limit her duties *during her pregnancy* to keep her out of harm's way. (Hicks Depo., 156-159, 161-166, 170-172, 175-181, 184, 186-187). In other words, her position remained that of a full-blown agent, but she was permitted to forego

performance of some of her duties on what she understood was a temporary basis. She admitted she knew that when she returned from maternity leave she would resume the *full* duties of an agent. (Hicks Depo., 202-204). She was restored to this position when she finally returned even though she was not entitled to it under the FMLA.

Finally, the Plaintiff's testimony waived any claim for failure to restore:

> "Q. So you are going to be on day shift?
> A. Yes.
> Q. And with only four or five agents, correct?
> A. Yes.
> Q. And did you see the necessity of you serving as a full agent?
> A. Yes.
> Q. And did you agree with it?
> A. Yes.
> Q. And as far as the pharmaceutical work that you had done before you left, that was being spread out amongst all the agents while you were on maternity leave, correct?
> A. I think any new cases that came in were spread out.
> Q. So that had been done as a stopgap while you were gone, correct?
> A. That's what he said.
> Q. I mean you don't have any reason to doubt that, correct?
> A. I don't know, you know. I don't know what cases were worked while I was gone.
> Q. And then having the pharmaceutical spread out among the agent[s], you had no objection to that, did you?
> A. No.
> Q. And he said that it might be – when the numbers got built up later on in terms of agents, that that pharmaceutical task might be put under a single person later on and you could apply for it. Did you have intentions for applying for it?
> A. I don't know that he was referring to getting more agents to get to that point, but I think they were just kind of piled up maybe and they wanted to get to a point where everybody was well rounded, they could work

> pharmacy cases, I could work meth, crack, so we could all work each other's cases. And then there may be a particular point where they would open it up and I think I was the only one interested in the Task Force. Sara Brissie had been assigned to it and did not want to do it.
>
> Q.   Did you want to, I mean several months later if they decided to bring it all back up under one person, did you want to apply for it?
> A.   Yes.
> Q.   Why did you want to do that?
> A.   I had a passion for working pharmacies, doctors.
> Q.   But in the meanwhile he very much wanted you to learn how to do all of the duties of an agent?
> A.   Yes.
> Q.   In other words, he wanted you to be fully trained and well rounded, correct?
> A.   Yes.
> Q.   And so you made no objection to that certainly, correct?
> A.   No.
> Q.   And you are not objecting to it now, are you?
> A.   No.

(Hicks Depo., 266-268, 349).

## B. Retaliation

The Plaintiff has waived several retaliation claims mentioned in her Complaint by failing to argue them. She now confines her retaliation claim to her: (1) "write up"; (2) the alleged failure to allow her to perform pharmaceuticals fraud work; (3) the alleged failure to train her and then criticizing her for not knowing how to perform her duties; and (4) her reassignment to patrol. (Doc. 21, p. 61). With one exception, each of these issues was addressed in the City's initial brief.

### 1.  The Write Up

The "write up," which was for reasons other than her leave, was simply an informal counseling and does not constitute adverse action.  (Doc. 17, p. 9).  She nonetheless disputes one of the topics covered in that counseling – the failure to have the oil changed in her assigned vehicle.  (Doc. 21, pp. 63-65).  She admitted in her deposition that she could not recall having it changed at any point while a member of the Task Force.  (Hicks Depo., 127, 217-218).  She now denies that she failed to have it changed but paradoxically blames it on others.  She also asserts that Captain Robertson, who ordered the counseling, relied solely on Lieutenant Richardson in concluding that the oil change was not made on a timely basis. (Doc. 21, p. 64).  But as the court will notice, the Plaintiff does not dispute the fact that Robertson believed she was in the wrong.  This, not the accuracy of an employer's conclusion that a party is an unsatisfactory employee or committed a wrong, is the issue for determining pretext.  *Fong v. School Bd. Of Palm Beach County, Fla.*, ___ Fed. Appx. ___, 2014 WL 5570460, * 4 (11th Cir., 2014).  And it is irrelevant from whom Robertson received the information on which he based his conclusion.  *Elrod v. Sears, Roebuck and Company*, 939 F.2d 1466, 1470 (11th Cir., 1991) ("We can assume for purposes of this opinion that the complaining employees interviewed by Rives were lying through their teeth.").  Besides, it is undisputed that Robertson relied on information from Sgt. Reginald

Spencer and Richardson on this issue. (Robertson Depo., 36). It is likewise irrelevant whether other Task Force agents failed to have their oil changed on a timely basis because the Plaintiff has adduced no evidence that Captain Robertson was aware of this. *Lee v. U.S. Steel Corp.*, 450 Fed. Appx. 834, 839 (11th Cir., 1989) ("A prima facie case of discriminatory motive must show that either Runnerstrom or Gerwens were aware of prior uses of the Unit truck by white officers for personal business…"). Robertson denied such knowledge. (Robertson Depo., 38).

Plaintiff's response regarding the other topic covered in that counseling session – issuing too many warrants in contravention to the training received from Richardson – is also a font of red herrings. She attempts to recast the reason for the counseling as the violation of a formal "rule" and then asserts that there was no such rule. (Doc. 21, pp. 65-66). But the law is clear that a plaintiff may not recast an employer's rationale and must meet it head on. *Fong v. School Bd. Of Palm Beach County, Fla., supra* at fn. 8; *Hawkins v. BBVA Compass Bancshares, Inc.*, 2014 WL 4715865, * 15 (N.D. Ala., 2014). She admitted in her deposition that Richardson, who was her initial training officer, trained her to limit the number of arrest warrants for pharmaceuticals fraud she issued against any single individual who committed multiple offenses and to instead issue a small number per pharmacy. (Hicks Depo., 129, 134-136, 191, 193). She now characterizes this as merely a "suggestion" made by Richardson, however, yet denies

contravening it. (Doc. 21, p. 66). But once again, the relevant question on summary judgment is not whether she did or did not but whether Captain Robertson believed that she had. The Plaintiff has presented no evidence even suggesting that he had any doubt whatsoever. Finally, she cites Agent Kimbrell as a comparator because he "obtained as many as 9 warrants for one defendant, and has not been written up." (Doc. 21, p. 66). But she presents no evidence that Kimbrell or any other agent issued this many warrants relating to incidents by a single suspect at a single pharmacy, much less did this on multiple occasions. Thus, she has no comparators and cannot show pretext. *Foster v. Biolife Plasma Services, LP*, 566 Fed. Appx. 808, 812 (11th Cir., 2014) (quantity and quality of the conduct must be the same).[1]

## 2.    Pharmaceutical Fraud

The Plaintiff initially listed the fact that "her pharmacy diversions [were] taken from her "as an action of retaliation." (Doc. 21, p. 61). But as the Court will notice, she does not actually argue this in her response. More particularly, she cites no evidence that this was in retaliation for taking leave or that Captain Robertson's rationale was pretextual. On the contrary, and as stated above, it was a change she

---

[1] The Plaintiff obviously harbors much animosity toward then Sgt. Richardson. (Doc. 21, p. 62). She asserts that Richardson was out to get her and "participated" in some of the decisionmaking in question. (*Id.*). She presents no evidence, however, that Richardson was a decisionmaker. It is undisputed that Captain Robertson defined the Plaintiff's duties upon her return from leave, decided that she be counseled (Doc. 21, p. 19), and then decided to recommend to Police Chief Anderson her reassignment to the patrol division.

admittedly welcomed. (Hicks Depo., 266-269, 349).

### 3. Failure to Train and Reassignment to Patrol

The Plaintiff does not contest Captain Robertson's rationale for reassigning her to patrol. She, instead, blames one of those reasons – her performance deficiencies – on her lack of training, which she now claims was retaliatory. (Doc. 1, pp. 67-68). The alleged failure to train the Plaintiff was not alleged in the FMLA retaliation portion of her Complaint. (Doc. 1, pp. 15 and 25, paras. 112, 164-69). Thus, that aspect of her claim was waived.

In any event, the Plaintiff was trained both before and after her leave. As a patrol officer she would have already learned how to work with informants, and training on this had continued while she was an agent. She had also been trained regarding search warrants and arrest warrants. (Hicks Depo., 112-115, 119-120, 122, 130-31). And as she conceded, training also occurs in the field by observing other agents, and she had been the beneficiary of this. (Hicks Depo., 110, 119-20, 122-23, 146-48). When she returned from leave this process was to continue. But Captain Robertson believed she was already sufficiently trained to perform her assigned duties. (Robertson Depo., 20-21, 119-20). It was the Plaintiff's job to properly perform her duties – just like the other agents – even if she incorrectly concluded that this was an unreasonable expectation – which it was not. *Fong, supra*, at * 5 (11th Cir., 2014)

(employer is "free to set unreasonable or even impossible standards, as long as she did not apply them in a discriminatory manner"), quoting *Alvarez v,. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1267 (11th Cir., 2010).  She simply did not perform her job despite her training and help from Captain Robertson.

### COUNT II – HOSTILE ENVIRONMENT

The Plaintiff maintains that she has adduced "subsstantial" [*sic*] evidence to support her hostile work environment claim.  (Doc. 21, p. 75).  She attempts to cast Sgt. Richardson, who is female and had borne several children, as her only harasser.  Her description of Richardson's conduct is not supported by the record.  Yet, taking everything she says Richardson did, and doubling it, it would not amount to an actionable case of hostile work environment sexual harassment.  She adduces no evidence that Richardson was motivated by the Plaintiff's sex.  She provides no evidence on the issue of pervasiveness, and the conduct she cites is simply not severe.  Indeed, she does not even establish that she was physically present when any of the alleged conduct supposedly occurred. (Doc. 21, p. 77-78).

### COUNT III – GENDER DISCRIMINATION

The Plaintiff cites only the grounds for her FMLA retaliation claim as grounds

for her gender discrimination claim. (Doc. 21, pp. 71-73).[2] Therefore, the City incorporates herein its previous arguments with regard to this claim.[3]

## COUNT IV – FLSA

The Plaintiff's argument regarding her claimed violation of 29 U.S.C. § 207(r)(l)(A) is also baseless. It is undisputed that the City provided all of its employees private lactation rooms to express milk. Although, as the Plaintiff notes, these were not at TPD headquarters (Doc. 21, p. 81), § 207 does not require an employer to provide them in each of its buildings and at each of its work sites. It merely requires "*a place.*"[4]

In addition, and as the Court will notice, the Plaintiff does not adduce any evidence that she was ever denied any break time for this purpose. On the contrary, she now concedes that "Richardson and Robertson told her to take breaks whenever she needed to express milk." (Doc. 21, p. 82). But the Plaintiff adds that complaints were made when she "would disappear at times." (*Id.*) Yet, she adduces no evidence that anyone knew where she had gone, much less that the complainers knew or even

---

[2] She, therefore, has waived several of her other claims. (See Doc. 17, pp. 14-15).

[3] The City would, however, point out that Agent Kimbrell, the person she claims replaced her on the Task Force, is and was actually an employee of the City of Northport and not the City of Tuscaloosa. (Kimbrell Depo., 8-9). Thus, he does not qualify as a comparator.

[4] § 207 also does not require an employee to utilize only the employer-provided lactation rooms for this purpose. The Plaintiff knew this and used her breaks to go to her home instead. (Doc. 21, pp. 26-27). Obviously, if she could drive home she could also drive over to City Hall where the rooms were located.

suspected she was on a break expressing milk. On the contrary, she admits Robertson did not know this. (Doc. 21, p. 27). Thus, her conclusory assertion that "[t]his ‑disappearance' to go pump was held against [her] and used to reassign her" simply holds no water.

The same goes for her argument that, after her reassignment to the patrol division, Captain Spruiell would not give her a written guarantee that "she would be allowed as much time as needed for pumping to go to City Hall." (Doc. 21, p. 83). It must be borne in mind that the Plaintiff never reported to work in the patrol division following her reassignment. (Hicks Depo., 373). Thus, unlike other breastfeeding patrol officers before her, she never gave the City the opportunity to comply or not with § 207 in this context. She simply used the failure to accede to her demand for a written guarantee as a pretext to quit and stay with her child as she has done ever since.

## COUNT V – FMLA RETALIATION

This claim has been addressed above with regard to Count I.

## COUNT VI – CONSTRUCTIVE DISCHARGE

The acts Plaintiff alleges were committed by the City were obviously insufficient to make her working conditions objectively intolerable. (Doc. 21, pp. 80-81). Those that she claims occurred before her reassignment to the patrol division did not cause her to resign from the Drug Task Force. On the contrary, she complains that it was wrong

to reassign her from the Task Force. Moreover, the "write up," her evaluation, and her post-leave duties and training on the Task Force were completely reasonable.[5]

So was her reassignment to patrol given her job performance issues. She denied to Captain Robertson that she was suffering any medical problems, leaving Captain Robertson to reasonably conclude that her poor performance was elective. The issues regarding the use of a vest have been fully addressed. (Doc. 17, p. 23). These issues were not the City's fault. Vests are simply a part of law enforcement.[6] Others had worn vests under identical circumstances without any problems. She also mentions the failure to give her a written guarantee regarding break times to go to the City Hall lactation rooms to express milk while on patrol (Doc. 21, p. 83), yet cites no evidence that the City ever failed to accord that time to patrol officers.

Furthermore, the Plaintiff does not attempt to counter any of the City's other arguments with respect to her constructive discharge claim. Her resignation was voluntary, not the product of coercion, duress, or fraud. (See also, Doc. 17, pp. 12-13, 22-24).

---

[5] She claims Sgt. Richardson called her names, but Richardson denies this and, in any event, the Plaintiff produced no evidence that any of this happened in her presence or that she ever complained. *Kilgore v. Thompson & Brock Management, Inc.*, 93 F. 3d 752, 754 (11th Cir., 1996) (affirming summary judgment). She also claims that the City did not comply with the FLSA regarding lactation rooms, but the fallacies of that claim are addressed above regarding Count IV.

[6] Vests are also worn by Drug Task Force agents. (Hicks Depo., 344-45).

## ? FLSA AND TITLE VII RETALIATION

Buried at the back of the Plaintiff's response is a newly minted claim for retaliation for complaining about violation of § 207 of the FLSA. (Doc. 21, p. 83). Because it was not pled, it was waived. Even if it had been pled, it is baseless.

As has been discussed above with regard to her FMLA retaliation claim, the Plaintiff has presented no evidence of a retaliatory motive or that any adverse action was taken against her because of any protected activity in which she may have engaged.

/s/ James P. Woodson, III
James P. Woodson, III (WOO043)

**OF COUNSEL:**
Senior Associate City Attorney
Office of City Attorney
P.O. Box 2089
Tuscaloosa, AL 35403
Telephone: (205) 248-5140
Attorney for Defendant City of Tuscaloosa

*Christopher Lyle McIlwain, Sr.*
Christopher L. McIlwain, Sr., MCI-002

**OF COUNSEL**

Hubbard, McIlwain & Brakefield, P.C.
P. O. Box 2427
Tuscaloosa, AL 35403-2427
 Telephone: (205) 345-6789
Attorney for Defendant City of Tuscaloosa

**CERTIFICATE OF SERVICE**

     I hereby certify that on January 15, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties, and I hereby certify that, to the best of my knowledge and belief, there are no non-CM/ECF participants to whom the foregoing is due to be mailed by way of the United States Postal Service.

*s/ Christopher Lyle McIlwain, Sr.*