FILED

2015 Oct-19  PM 02:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE HICKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:13-cv-02063-TMP |
| | ) | |
| CITY OF TUSCALOOSA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment filed November 14, 2014, by the defendant, City of Tuscaloosa ("City").  (Doc. 15).  The City seeks dismissal of all of Stephanie Hicks' ("Plaintiff") claims arising from alleged discriminatory treatment she received during and after her pregnancy.  This matter has been fully briefed, and the court has considered the evidence and arguments set forth by both parties.  The parties have consented to the exercise of jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence

of a genuine issue of material fact."  Celotex Corp. v. Catrett, 47 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict:

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-252; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).  Utilizing

these standards, the court undertakes the analysis of whether the defendant has shown that it is entitled to judgment as a matter of law.

## FACTS

The facts, taken in the light most favorable to the nonmoving party are as follows.  The plaintiff, at all relevant times, worked for the Tuscaloosa Police Department ("TPD") as a patrol officer or on the West Alabama Narcotics Squad.  Plaintiff was first hired as a patrol officer, eventually becoming a field training officer.  In 2009, she worked temporarily as an undercover agent in the West Alabama Narcotics Squad ("WANS").  Her supervisor at that time was Captain Snyder ("Snyder").  Captain Wayne Robertson ("Robertson") also was assigned WANS at the time.  He and the plaintiff got along without conflict.  The plaintiff received an Officer Commendation award from Snyder and Robertson on November 10, 2009, in which they praised the plaintiff's job performance.  After serving as an undercover agent in WANS, the plaintiff returned to patrol and became a field training officer.  Later, Snyder and Sergeant Dortheen Richardson ("Richardson") informed the plaintiff that WANS was looking for a pharmacy diversion investigator, and suggested that she submit a letter of interest if she wanted the position. The plaintiff applied for the position and was selected.  She was transferred to WANS on November 18, 2011, and the plaintiff reported for duty on November 21, 2011.  At the time of her transfer, the plaintiff was not planning a family, and she did not expect a desk job or limited duties.  The plaintiff's title was "investigator," and she primarily worked in pharmaceutical and prescription fraud.  When the plaintiff began working for WANS, the only shift was a day shift from 8:00 a.m. to 4:00 p.m., Monday through Friday, and there were 10-15 agents, including

supervisors, working in WANS.   The agents rotated "on-call" duties after hours and on weekends.

WANS Standard Operating Procedure ("SOP") requires agents to have both school and field training.  Accordingly, new agents are assigned a field training officer to train new agents in the field.  The field training officer checks off categories of training on a Field Training Agent form as the new agent completes training in each area.  The WANS Unit Commander evaluates the new agent after three months and again after six months.  After the six-month evaluation, the Unit Commander makes a determination as to whether the new agent's progress is acceptable and, if so, the new agent will be added to the on-call list.  The new agent would be unable to perform the job without field training.  Sgt. Richardson was assigned to be the plaintiff's field training agent from November 21, 2011, to December 13, 2011.  During this period, Richardson was in rehabilitation three times per week to rehabilitate an on-the-job injury she had on November 4, 2011.  Richardson did not return to work until March 2012.  Contrary to procedure, on the plaintiff's first day in WANS, Richardson noted on the Field Training Agent form that the plaintiff was trained in numerous areas of field training.  When the plaintiff inquired, Richardson assured her that she would be trained on all of the field training areas later.   Some items eventually were covered, such as forms, but some were not, such as case format.  The plaintiff already was certified to perform marijuana field tests, but she was not certified on methamphetamine or heroin field tests.   She did not receive training on how to obtain a confidential informant, how to get an informant to work, and how to debrief an informant.  Sgt. Richardson did not train the plaintiff on the remaining items listed on the Field Training Agent form and never trained the plaintiff on prescription fraud.  The Field Training Agent form is the only documentation recording the plaintiff's training.

Later, Sergeant Spencer ("Spencer") was assigned to the plaintiff as her field training agent. Spencer served as the plaintiff's field training agent until he was promoted on December 30, 2011. The plaintiff remembers spending only one day with Spencer before he was promoted. The plaintiff requested to be assigned another field training agent, but never was. The other agents in WANS received training pursuant to the SOP, and kept the same field training officer for the duration of their training. Two male agents transferred to WANS after the plaintiff, and they received training pursuant to the SOP.

The plaintiff learned of her pregnancy on January 6, 2012. She informed Capt. Snyder of her pregnancy and asked what the policies were for pregnant employees. She was informed that no policies were in place for pregnant employees. The plaintiff consulted with Chief Anderson ("Anderson"), who told her that it was at the discretion of her supervisor, Capt. Snyder. Snyder limited the plaintiff's duties by asking her not to: 1) travel for training classes; 2) go on call; 3) be alone when working on cases in the field; 4) get recertified with her firearm due to the potential lead exposure; and 5) work on methamphetamine-related cases. Also, when a search or arrest warrant was being executed, Snyder instructed the plaintiff to enter the premises last to take photographs or evidence logs. The plaintiff requested to continue training, but was told by Snyder that her training would resume when she returned from maternity leave.

In March of 2012, Sgt. Richardson, the plaintiff's original field training agent, returned from medical leave. At that time, the plaintiff already had been assigned to Pharmacy Diversions. Richardson was not aware whether the plaintiff was assigned a field training agent for the six months Richardson was on medical leave. (Richardson Depo., Doc. 22-6, p. 23). At that time, the plaintiff's duties had been limited by Capt. Snyder, and she was not going on calls other than Pharmacy Diversions. Richardson testified that it "bother[ed]" her that the plaintiff

was not required to go on other calls.  (Richardson Depo., Doc. 23-1, p. 74).  Richardson's opinion was that the plaintiff's duties should have been the same as the other WANS agents. Years earlier, Richardson had two children while she was assigned to WANS, but the Family and Medical Leave Act ("FMLA") was not in place at the time.  Snyder was Richardson's supervisor in 2003 when she had her second child.  Richardson stated her duties were not limited in any way during her pregnancy and, after the birth of her child, she resumed her full duties as an agent.  Richardson claims that the plaintiff's treatment was preferential, but Chief Anderson testified in his deposition that other pregnant employees' duties were limited during their pregnancies. (Anderson, depo., Doc, 29-7, p. 79).

Capt. Robertson replaced Snyder as the WANS supervisor in July 2012.  Hicks was not aware of any changes made by Robertson in the way WANS operated prior to her maternity leave.  She informed Robertson that Snyder limited her duties, and asked if Robertson would like her to do things differently.  Robertson responded that he did not want the plaintiff serving arrest warrants.  Robertson testified that he was waiting for the plaintiff to return from maternity leave to place her on-call and that the plaintiff only worked Pharmacy Diversions while she was pregnant.  The plaintiff requested FMLA leave to begin August 20, 2012, for the birth of her baby, and planned to return to WANS after her leave.  Chief Anderson approved the plaintiff's FMLA leave.

On August 8, 2012, the plaintiff received her annual evaluation for the period from October 29, 2011 to October 29, 2012.[1]  (Doc. 23-8).  Her job classification was Police Patrol Officer, and her overall performance was evaluated as "exceeds expectations."  (Id.)  In specific

---

[1]  Presumably, her annual evaluation was performed early, because the plaintiff's leave was scheduled to begin August 20, 2012 and continue through the end of the evaluation period.

areas of evaluation, the plaintiff was evaluated as exceeding expectations, or greatly exceeding expectations.  (Id.)  Sgt. Richardson made the following comments on the plaintiff's annual evaluation:

> Comments on Performance:
>
> Although Agent Hicks has taken on a new area that challenges her knowledge and skills, she is doing well and with more experience she will be more successful in her investigations.  Her reports are thorough and are completed in a timely manner.  She's well spoken and works well with others.  She seems to enjoy what she's doing.  She takes on new challenges as they come and performs well at them.
>
> Areas Requiring Improvement: . . .
>
> Although Agent Hicks has learned a great deal about her current assignment, she needs to be more assertive and aggressive in her investigations.
>
> Goals: . . .
>
> This year we are going to work on being more assertive and aggressive while working informants and during her investigations.
>
> Qualifications/Achievements: . . .
>
> Agent Hicks has learned a great deal in a short time-alone.  She request [sic] schools that will aid her in knowledge of her investigations.  She takes on a challenge and meets it head on.

(Doc. 23-8, p. 2).  The evaluation does not mention any criticism of Hicks for obtaining too many warrants on a single defendant.

Before Hicks began her FMLA leave, Sgt. Richardson told her that she did not need to take the full 12 weeks of leave, and that Richardson had not taken the full 12 weeks when she had her children.  Richardson informed Hicks that when Richardson was working Pharmacy

Diversion, she would obtain only a few warrants against any individual suspect, while sending the other charges related to the suspect straight to the Grand Jury.  However, Richardson did not order Hicks to obtain warrants in the same manner or to obtain 10 or fewer warrants for a single defendant, and Hicks was not disciplined for the manner in which she obtained warrants.[2]  Prior to taking her FMLA leave, Hicks had completed warrants for two cases she had been working.  Richardson did not issue a communication to the WANS unit regarding the proper procedure for obtaining warrants or how many warrants were appropriate in a given situation.  Robertson was polite and professional while interacting with Hicks before Hicks took her FMLA leave.  Hicks began her leave on August 23, 2012.  Her child was born with the following health problems: colic, a broken collar bone, reflux, and RSV.[3]  The RSV was contagious, and the child required breathing treatments every six hours.

The plaintiff returned from leave on November 26, 2012.[4]  She was motivated to get back to work and was not reluctant to return to her job.  The plaintiff was passionate about her work with pharmaceutical fraud.  Within an hour of beginning her first day back at work, the plaintiff was called into Capt. Robertson's office to speak with him and Sgt. Richardson.  The plaintiff

---

[2]   At some point in time, a $35 administrative fee was levied for each arrest warrant.  The more warrants obtained against a defendant, the higher the costs incurred by the defendant.  Once an individual was arrested, additional charges could be added by the grand jury indictment without running up the administrative costs of more arrest warrants.

[3]   RSV stands for Respiratory Syncytial Virus, which is a common respiratory infection much like a common cold.  However, according to the Mayo Clinic website, "[i]nfection with respiratory syncytial virus can be severe in some cases, especially in premature babies and infants with underlying health conditions."  See http://www.mayoclinic.org/diseases-conditions/respiratory-syncytial-virus/basics/definition/con-20022497 (as of Sept. 28, 2015).

[4]   The plaintiff explains the fact that she was away from work for more than 12 weeks by noting that she took three days of paid leave due to the sickness of her child.  The other days, November 22 to 25 were over the Thanksgiving holiday and weekend, during which she was not scheduled to work.

was written up in the form of an "informal counseling" for allowing her vehicle to go 1200 miles

over the limit for recommended oil changes without changing the oil and for continuing to obtain

multiple warrants for individual defendants.    The plaintiff also was given a "quarterly

evaluation," dating from July 1, 2012 to September 30, 2012.    The plaintiff's informal

counseling letter from the November 26 meeting states:

> This letter serves as documentation of an INFORMAL VERBAL COUNSELING being held with you concerning: 1. Failure to Obey a Direct Order and 2. Violation of PGO 11, Care and Use of Police Vehicle.
>
> 1. In April 2012, after finding out that you had generated 24 I/O Reports on William Bodin you were informed by me to choose only five cases to charge the suspect with and I explained why.  After being explained this for the second time, you still obtained 24 warrants on the defendant.  This caused personnel from the Tuscaloosa County District Attorney Office to question our integrity and informed this Unit of the scrutiny it brings to the Unit and the Courts because of the new law allowing the courts to charge a defendant an [sic] $35.00 fee per charge in addition to the bond.  You were informed that when investigating a suspect and you find that the suspect has multiple cases at one Pharmacy then choose a couple or if more Pharmacies are involved to choose one from each Pharmacy and list the other cases in the WANS 100s and the Grand Jury would indict if sufficient grounds for the charges exist.  In July, Cynthia Ralston, another RX Forger was arrested on 20 warrants that you obtained.  Again you were asked why you obtained these warrants after being told not to and your response was that you had already generated the reports and you were attempting to build your stats.  You were told just because you generated the reports you didn't have to obtained [sic] warrants for each case.  After being told repeatedly about this you obtained 15 warrants on Ariel Miller, another RX Forgery suspect.
> 2. Violation of PGO 11, Care and Use of Police Vehicles.  When your vehicle was picked up from your residence by me and Sgt. Spencer in September 2012, it was noticed that your oil change mileage was 1200 miles over the recommended mileage.  As an Officer with Tuscaloosa Police Dept. and assigned a take home vehicle as part of your equipment in Narcotics it is your responsibility to schedule regular maintenance and servicing of a said vehicle.
>
> Issues covered during this informal counseling were:
>
> 1. Disobeying a Direct Order

2.  Care and Use of Equipment
3.  Any future violations will result in progressive discipline.


(Doc. 24-2).  The letter was dated November 26, 2012, the day the plaintiff returned from leave, and was signed by Richardson and Robertson.  The plaintiff's quarterly evaluation rates her job knowledge as unsatisfactory; her work quality, dependability, initiative, and judgment as fair; her communication skills as good; her attitude as very good; and her punctuality, appearance, and attendance as excellent, and she received an overall evaluation score of 3.1 out of 5.  (Doc. 24-3).  Plaintiff wrote in the "Employee's Comments" section of the quarterly evaluation that she was "assigned to this unit late November 2011.  My training was limited because a supervisor was out on injury and shortly after an agent was promoted.  Both persons were to aid in my training.  Shortly after I became pregnant.  Late August I went out on maternity leave and came back to work today 11-26-12."  (Doc. 24-3).  The plaintiff did not drive her vehicle over the mileage for the recommended oil change after the write up, nor did she obtain multiple warrants on a single defendant.

Hicks had not seen a quarterly review prior to this occasion.  The WANS SOP indicates that agents will be evaluated on a six-month basis.  The evaluation was dated July 1, 2012 to September 30, 2012, which was the same date range as the annual evaluation that Hicks received before beginning her leave.  Hicks worked from August 8, 2012, to August 23, 2012, and then did not work anymore from the time she received the annual evaluation to the time she received the quarterly evaluation.  The quarterly evaluation contradicts the annual evaluation, on which Hicks was scored much higher.  To explain the discrepancy, Richardson asserts that the general practice was to put false information on the annual evaluation so as "not to injure someone's

chances of getting a raise by being brutally frank on their annual performance appraisals." (Richardson Depo., 23-1, p. 108).  Hicks was told that the Captain would look at three quarterly reports, gauge improvements, and, if none occurred, the employee would be let go.  Despite the contradiction in the reports, the quarterly evaluation acknowledged Hicks' lack of training. Hicks expected to receive more training upon her return from FMLA leave.  At the meeting, Richardson informed Hicks that she would try and find schools for her to attend to further her training.

During the November 26 meeting, Richardson and Robertson informed Hicks that she should meet with Sergeant Barker regarding SOP changes, but they did not provide copies of the changes at the meeting.  Richardson is unaware of whether Hicks ever met with Barker to discuss the changes.  Also discussed during the meeting was additional field training for Hicks to make her more well-rounded as an investigator.  Specifically, Hicks was asked whether she had been trained on how to work with confidential informants.  Hicks informed Richardson and Robertson that she had gone to no schools and had no training about informants, meth labs, or tech certification.  No further training was provided to Hicks after she returned from FMLA leave.  After the meeting, Hicks overheard Richardson and Robertson discussing wanting to "get rid of that little bitch" and that they would find "any way" they could to do so.  Sgt. Richardson admits she may have called Hicks a "bitch."

Hicks discussed with Richardson and Robertson the fact that she was breastfeeding her new child.  She also informed them that she would be picking up her baby from daycare at 4:30 p.m., but that it should not interfere with her shift, which was 8:00 a.m. to 4:00 p.m.  Robertson immediately informed Hicks that her shift was being changed, so her child care arrangements would not work.  Shift changes were made at Robertson's discretion.  Richardson informed

Hicks that the police station did not have a pumping area similar to the lactation rooms at City Hall and that Hicks should tell Linda[5] when she needed to take a break to express breast milk. Hicks asked if she could use the records room to express breast milk, but Richardson indicated that Hicks should use the locker room/bathrooms.  Richardson told Hicks that there was no need for her to note on the "board" that she had gone to take a break to express breast milk.  The locker rooms are not private or sanitary and are used by city employees as well as civilians. Another officer, Busby, had complained to City Attorney Jimbo Woodson about the locker room location when she was required to use it to express breast milk.  Hicks expressed breast milk in the locker room at work roughly twice a day.  Every time Hicks expressed breast milk at work, someone entered the locker room.  On a couple of occasions, Hicks used her lunch break to go and express breast milk at her home.  Richardson and Robertson complained about Hicks leaving for periods during the day, but Robertson did not send anyone to the locker room to see if Hicks was expressing breast milk.  Hicks, Busby, and Richardson testified that it could take 15 to 30 minutes or more to pump.  Hicks' doctor recommended that she pump three times per day. Hicks was not able to predict exactly when she would need to pump, the need depended on production and how much the baby eats.  Busby and Richardson each state that they expressed breast milk two to three times per day when breastfeeding.  Richardson acknowledged that breastfeeding and lactating are conditions of being pregnant.

Robertson, Windham, and Coffee noticed a change in Hicks when she returned from FMLA leave, and Richardson commented that she was "different."  Capt. Robertson inquired whether Hicks was suffering from post-partum depression and suggested she contact the Employee Assistance Program ("EAP").  Richardson also stated that she thought Hicks was

---

[5]  It is unclear who Linda is or what her role is in WANS.

suffering from post-partum depression.  Hicks was not aware at the time that anything was wrong with her.  Coffee, a fellow WANS agent, stated to Hicks that they were not happy with her on her return from FMLA leave and that she was not the same person, emotionally.  Coffee also mentioned to Hicks that Sgt. Richardson was talking about her and not knowing what Richardson had against Hicks but that Richardson was trying to "run her out" of narcotics. Hicks also was criticized for taking the full FMLA period of 12 weeks.  Johnson, a TPD patrol officer, overheard Richardson discussing Hicks' maternity leave with other WANS agents, and Richardson stated, "[s]he thinks she gets twelve weeks, I know for a fact she only gets six weeks."  Johnson testified that Richardson was speaking loudly when she said this and that she used the word "cunt" during the conversation.  From June 2010 to 2014, another female agent in WANS, Sara Brissie ("Brissie") received extensive counseling for lack of job knowledge, failure to follow policies and procedures, delay of investigation, improperly conducting investigations, and mishandling of evidence.  She also received formal and informal counseling regarding her work with informants.  However, Brissie took only six to eight weeks of maternity leave.  Brissie was not reassigned to patrol.

Hicks took off work on November 28 and December 5, 2012.  On December 6, Hicks came to work for a mandatory squad meeting, but she was charged a sick day.  Richardson told Hicks that she already had marked her as taking an AVAIL day, but Washington told Hicks she only would be charged a half day.  Hicks was not paid for the time she was present on December 6, and her records indicate that she was charged a sick day.  On December 7, 2012, at 8:00 a.m., Robertson informed Hicks that Chief Anderson wanted to speak with her.  Anderson told Hicks that she was being reassigned.    The reassignment was not voluntary.  Hicks told Anderson that she did not wish to be reassigned after being back at work for only eight days and

that she was excited about learning more about narcotics and working in WANS. Hicks told Anderson that her duties in WANS had been limited while she was pregnant. Anderson was unconcerned. Anderson stated that he had the final say, but deferred to Robertson, the WANS commander, when making the decision of Hicks' reassignment. Anderson acknowledged that eight days was not long enough to make improvements after informal counseling. He further admits that Hicks' lack of knowledge should not have been held against her since she had not been fully trained.

Later that day, December 7, Sgt. Richardson wrote a letter/memorandum to Assistant Chief Dunn, outlining the reasons for plaintiff's involuntary reassignment to patrol duties. At various points in the letter, she reported that plaintiff's "motivation in the Unit [had] changed" and that she "shows no initiative or motivation to better her investigative skills or knowledge or to be a part of the unit." (Plaintiff's Ex. T., Doc. 24-8, p. 1) She wrote also that Capt. Robertson, she, and Sgt. Barker "all feel that [plaintiff] doesn't have any motivation or has shown any initiative to improve her knowledge of this job. She is un-involved in the activities of this unit." (Id., p. 3).

When Hicks was reassigned, she had worked only six full duty days after returning from leave. The Tuscaloosa Code of Ordinances states that "[a] reduction in rank and/or involuntary assignment to a different position with a lower pay grade" is a Class B disciplinary action. (Doc. 26-2, p. 1). The Tuscaloosa Code of Ordinances further states that "[n]o regular-status employee may be suspended without pay, demoted, dismissed, or otherwise deprived of any constitutionally protected property interest in his or her job unless he or she has been afforded the opportunity of a predisciplinary hearing." (Doc. 26-2, p.3). Hicks was not given a disciplinary hearing prior to being reassigned from WANS to patrol, which constituted a

demotion because her pay was reduced.  Richardson knew that Hicks was either pregnant or on maternity leave for a year prior to being reassigned and that she had not been trained on multiple aspects of her job, including working with confidential informants.  Richardson also acknowledged that Hicks had been back at work for only eight days prior to being reassigned. Hicks' duties and the conditions of her employment changed subsequent to her reassignment. WANS is more prestigious than patrol, and when Hicks left WANS she was no longer an investigator, losing the pay supplement that went with being an investigator.  Hicks was assigned to work a beat in patrol and she no longer was guaranteed weekends off or a day shift.  Hicks lost her assigned vehicle and her investigator pay, which was $1,103.44 more, annually, than patrol officers.  Further, WANS agents are not required to wear a protective vest all day, whereas patrol officers are.  On December 13, 2012, Richardson told Hicks that she, Robertson, and Barker decided to reassign her.  Richardson asserts that she did not participate in the decision to demote Hicks, but that she did write the December 7, 2012 letter outlining the reasons for Hicks' demotion.

Hicks reported to Patrol to discuss her duties with her supervisors.  When she was asked why she decided to transfer out of WANS, she explained that she did not volunteer for the change in position.  Upon hearing about this, Capt. Robertson yelled at Hicks for "badmouthing" the WANS unit.  After Hicks was reassigned to patrol, she was told by her lactation nurse that she should not wear a tight-fitting ballistics vest while breastfeeding.  On December 12, 2013, Hicks sought help from EAP for counseling.  Hicks was diagnosed on December 13, 2012 with post-partum depression.  She was experiencing difficulty breathing, sleeping, and focusing, and was suffering with anxiety.  Hicks' doctor recommended that she take time off.  On December 27, 2012, Hicks' doctor, Sid Smith, mailed a letter to Chief Anderson requesting that

Hicks be given the accommodation of being placed on a desk job for a few months while breastfeeding because wearing a vest could impede milk production or cause infection. Hicks sent Chief Anderson an email on January 2, 2013 to confirm that he received the letter. Anderson responded, stating that he did receive the letter and had discussed it with Major Spruiell and Captain Pearson, and that they intended to accommodate Hicks. Hicks returned to EAP for counseling services on January 2, 2013. January 3 and 4 were Hicks' days off, and she was expected to report to patrol on January 5, 2013.

On January 4, 2013, Hicks came into the office to speak with Chief Anderson and Major Spruiell regarding her concerns about breastfeeding while working in patrol. Anderson and Spruiell told Hicks she could work patrol without a vest or she could wear a larger vest. The City policy requires patrol officers to wear vests that meet certain standards for fit. (Doc. 26-5, p. 1). If the vest is too loose or not properly tightened over the chest, it would not serve its purpose of protecting against gunshots. To fit properly, a vest should fit securely and cover the vital organs. Hicks always had worn a vest when she was on patrol, and Johnson, Busby, Coffee, and Windham all testified to wearing a vest every day while on patrol. Windham further testified that he was not aware of anyone not wearing a vest while on patrol. If Hicks had remained in WANS, she could have continued her duties because vests are worn in WANS only when executing a search warrant or making an arrest. Many WANS agents would remove their vests when suspects were detained and any threat had been removed. Windham testified that, unlike patrol, he did not wear a vest at all times when he worked in WANS. While Hicks was pregnant she would enter a scene last and take photographs or handle evidence logs. She could have continued to do this work while breastfeeding. On the other hand, when working patrol, there are days when an officer does not get a break. A patrol officer is not permitted to leave the

scene of an active call before finishing the call.  A call possibly could last the officer's entire shift, and there is no way to predict the calls coming in during the day.  A patrol officer does not know when she can take a break during the shift.  The patrol officer must request a break from the dispatcher, at which point the officer will be put in line to be relieved by other officers for a break.  The time between the call to the dispatcher and the break can differ depending on if the officer has a beat partner or if there is another officer in the area.  Hicks never worked with any pregnant officers while on patrol.  Busby never worked on patrol while breastfeeding, and there has not been a female officer in the field on patrol while breastfeeding.

Spruiell told Hicks that she could be assigned to the Riverwalk beat so that she could go to City Hall and express breastmilk in the lactation rooms available there.  Spruiell and Anderson would not agree to put in writing that Hicks would have as much time as she required to go to City Hall to pump milk.  Hicks asked to be placed on a desk job while she was breastfeeding, as the TPD has patrol officers at the station desk 24 hours per day.  Other breastfeeding officers have been assigned to the Criminal Investigation Department ("CID") on a temporary basis.  Hicks also was not weapons certified.  Her last certification was in April 2011, and APOST requires recertification each year.  When Hicks informed her WANS supervisor, Snyder, of her pregnancy in January 2012, he restricted her duties and instructed her not to get recertified with her firearm due to potential lead exposure.  Accordingly, Hicks had not yet renewed her weapons certification.  She also did not have a patrol uniform.

Hicks submitted her letter of resignation on January 4, 2013, after her meeting with Anderson and Spruiell.  Hicks did not feel that the accommodations suggested were adequate to allow her to continue to breastfeed and do her job safely.  Accordingly, the plaintiff submitted her resignation on January 4, 2013.

Prior to submitting her resignation, the plaintiff was written-up or "counseled" regarding various infractions that she allegedly committed, which are discussed below.

### A.  *The Plaintiff's Husband Used Her Work Vehicle*

On September 8, 2012, while the plaintiff was on FMLA leave, her husband, a uniformed TPD officer, was assigned to work the first home football game at the University of Alabama. He used the plaintiff's work-issued vehicle because his had been pulled to use as an extra vehicle in preparation for severe weather.  That same day, Richardson and Spencer came to the plaintiff's home and picked up her WANS vehicle.  The plaintiff did not speak to them because she was breastfeeding her baby.  There was no Procedural General Order ("PGO") relating to officers driving each other's vehicles.  No one in WANS told Hicks that other officers were not allowed to drive her vehicle.  In fact, Hicks' husband had previously been granted permission by Snyder to drive her WANS vehicle at any time.  TPD officers were allowed to swap vehicles. Other agents, specifically Herron and Richardson, who were not pregnant, kept their work vehicles at home during medical leave, and the vehicles were not pulled from them.

On September 10, 2012, two days after Richardson's car was picked up, Richardson sent an email to all of WANS stating that there was no SOP disallowing other officers to drive WANS vehicles, but the other officers must ask permission before doing so.  After this email was sent, Windham called the plaintiff and told her that he heard Richardson and Agent Brissie discussing the possibility that the plaintiff may be written up when she returned from leave. Windham told the plaintiff that Richardson and Brissie stated that the plaintiff had been gone for too long and that they intended to find reasons to write the plaintiff up to "run her off" of narcotics.

### B.  *Failure to Change Oil*

TPD PGO 11A states that the responsibility of scheduling car maintenance is that of the shop foreman.  How frequently a vehicle is due for an oil change depends on the vehicle's mileage.  Generally, an oil change is needed between every 3,000 and 5,000 miles.  Mike Lane ("Lane") is the fleet maintenance supervisor for the TPD.  He testified that the plaintiff's vehicle called for an oil change every 3,000 miles, but there is no documentation reflecting the mileage interval for her vehicle.  Lane claims that he has memorized the mileage interval for the various vehicles in the TPD fleet.  Neither the plaintiff nor her husband knew what the mileage on the vehicle was when it was picked up during the plaintiff's leave in September 2012, and the City does not have a document to show the mileage.  Robertson also states that he does not know what the mileage of the vehicle was on the day it was picked up.  He testified that he was advised by Richardson that the plaintiff was 1,200 miles beyond the mileage that required an oil change, but he did nothing to verify the information.

The vehicle service records categorize oil changes as "preventative maintenance."  If there is an entry of "preventative maintenance" in a vehicle's service record, an oil change was performed.  It is standard operating procedure for the shop to check the sticker and change the oil if necessary if a vehicle is brought into the shop for any reason.  Ordinarily, a vehicle would be serviced on the day it arrived in the shop.  There is no reason that a vehicle should sit in the shop for a month.  The plaintiff took her vehicle to the shop for an oil change in March 2012, with a mileage of 74,470.  On May 3, 2012, she brought her vehicle into the shop for work on the cooling system.  The mileage was 78,240, so the vehicle was due for an oil change.  Lane testified that the oil was not changed and that it was the shop's oversight.  A week later, the plaintiff went to the Tuscaloosa Department of Transportation ("TDOT") for service to her tires, and the mileage on the TDOT service record was 78,240 – the same mileage that was recorded a

week previously.   The car was picked up from Hicks by Richardson and Spencer on September 8, 2012, and there is no record as to the mileage on that date.  The next recorded oil change to the vehicle occurred almost a month later, on October 5, 2012, while the plaintiff was still on maternity leave.  The mileage was recorded as 82,300, or 4,060 miles more than when the shop had failed to change the oil in May 2012.  It is not known whether or by whom the car may have been driven for almost a month after it was retrieved from Hicks.  Had the shop performed the oil change as preventative maintenance in May 2012, the vehicle would have been at most 1,060 over the oil change mileage,[6] but the vehicle may have been within range if the plaintiff's car called for a change only every 5,000 miles.  Lane is unaware of whether the plaintiff's vehicle was driven during the time it was picked up at the plaintiff's home and when the vehicle was brought into the shop in October.

Other vehicles used by officers in the WANS unit were commonly over the mileage limit for an oil change when they actually received one.  Before the plaintiff, Lane had not heard of any employee being written up or transferred to another unit for failing to change the oil.  He testified that he would notify the supervisor if the violation was blatant or was double the miles or greater over the mileage limit.  Officers Windham, Coffee, and Busby testified to driving over

---

[6]   In May 2012, when plaintiff took the car in for air conditioning work, the recorded mileage was 78,240 miles.  If the oil had been changed then (even though Lane admits it was not due to an oversight at the TPD shop), the next needed oil change would have been at approximately 81,240 miles.  When the oil was changed in October 2012, after it was pulled from plaintiff a month earlier, the recorded mileage was 82,300, or 1,060 over the 3,000-mile limit. There is no record to show that the extra 1,060 miles were not added to the car in the month after it was pulled from plaintiff.  If the excessive miles were on the car at the time it was pulled from plaintiff, the court must infer that the car was not used at all during the month after it was taken from her, despite the assertion by defendant that it was needed while she was on maternity leave. Viewing the inferences favorably to the plaintiff, it was not her fault that the TPD shop failed to change the oil in May 2012, and it is likely that the car had not exceeded the next 3,000-mile oil change limit when it was pulled from her in September 2012.

the mileage limit without having the oil changed in their vehicles, yet they were not disciplined. (Windham Depo., Doc. 23-2, p. 15; Coffee Depo., Doc. 25-6, pp-18-20; Busby Depo., Doc. 25-5, pp. 23-24).  Windham and Coffee testified that they did not know of any officers other than Hicks who had been disciplined for failing to change the oil in a vehicle.  (Windham Depo., Doc. 23-2, p. 15; Coffee Depo., Doc. 25-6, pp. 18-20).  Busby testified to knowing of one officer other than Hicks who had been disciplined for failing to change the oil in a vehicle.  (Busby Depo., Doc. 25-5, pp. 23-24).

### C.  Obtaining Multiple Warrants

According to the November 26 letter, the plaintiff was written up for obtaining multiple warrants on a single defendant when she was instructed not to.  TPD does not have a PGO concerning how to obtain an arrest warrant or the number of warrants an agent can or should obtain for multiple offenses by an individual.  There also is no SOP regarding the number of warrants an agent can obtain.  Generally, an agent gathers evidence, makes a report, types a deposition stating probable cause, takes the deposition to the warrant clerk, and has the clerk sign and issue the warrant.  After the warrant is issued, it is given back to the agent to serve it (i.e., make the arrest), or, if the agent is unable to find the person, the warrant is filed.

The extent of the plaintiff's training regarding warrants was that, when there is probable cause to suspect an offense, the officer is to obtain a warrant for each offense and work the case like any other.  Agents McKenzie and Windham in narcotics taught the plaintiff this procedure prior to beginning her FMLA leave.  The plaintiff was never told to try to limit the number of warrants she had issued to ten or fewer.  The plaintiff did not receive bonuses or raises based on the number of warrants she obtained.  Although Richardson told the plaintiff that her procedure was to obtain a few warrants while adding all other incidents to the "felony pack" sent to the

prosecuting office, Richardson did not instruct the plaintiff that she was required to seek warrants in that way.  In July 2012, Richardson, at Capt. Robertson's direction, revised the WANS SOP, but the revised SOP did not limit the number of arrest warrants for any individual subject.

Robertson testified that, to his knowledge, the plaintiff is the only officer who has been written up for issuing multiple warrants on a single defendant.  (Robertson Depo., Doc. 29-2, p. 95).  Other WANS officers, specifically Kimbrell, Windham, and Herron, have obtained multiple warrants against a single defendant without being written up.  The plaintiff's husband, Matthew Hicks, testified that, as a TPD officer, he served multiple warrants from the WANS unit on a single defendant on a "[p]retty regular basis."  (M. Hicks Depo., Doc. 29-4, p. 11).  For example, Kimbrell began working in pharmaceuticals in June 2013 and has obtained multiple warrants for prescription related charges against one person.  Kimbrell testifies that how many warrants are issued for any given defendant depends on what the defendant is alleged to have done.  (Kimbrell Depo., Doc. 25-7, pp. 9-10).  He goes on to say that most defendants who forge prescriptions get more than one drug at a time and forge prescriptions more than once before being caught.  (Id.)  At one point, Kimbrell received nine warrants that resulted in 81 charges on a defendant after Grand Jury presentment, and he stated that the agent has the discretion concerning on which charges to seek a warrant and which to send straight to the Grand Jury. Neither Richardson nor the City has produced any document indicating that agents are trained to obtain ten or fewer warrants for any single defendant.  Richardson testified that a prior defendant complained that, due to the $35.00 Bail Bond Act charges attached to each warrant, it appeared the police department was conspiring with the district attorney's office to increase fees for defendants.  Richardson confirmed that neither she nor Hicks was aware of the $35.00 charge

until the complaint, and Richardson asserts that she spoke to Hicks about the charge and the complaint in April 2012.

### D.  *Confidential Informants*

On December 7, 2012, Sgt. Richardson wrote a letter to Assistant Chief Dunn asking that Hicks be removed from her position in WANS.  (Doc. 24-8).   One problem Richardson addressed in her letter was the plaintiff's failure to work with confidential informants.  Hicks never received training on working with informants before her FMLA leave, and Hicks was unable to complete field training regarding informants in her short time back at work after taking FMLA leave.   After she returned from FMLA leave, Hicks met with Brissie and one of her informants, but, at that meeting, Brissie left the room without giving Hicks any guidance or instruction regarding the informant.  Windham testified that it is not proper training simply to be introduced to an informant and then left alone with him or her.   Brissie told Robertson that an informant tried to call Hicks, but that Hicks would not return the informant's call.   Robertson did not verify this information and did not ask Hicks about it, nor does Robertson have any documentation regarding the call.   After Hicks' meeting with Richardson and Robertson on November 26, Coffee allowed Hicks to meet with one of his informants.  Hicks states that she rode along with Coffee and the informant for one day, but was not assigned to the informant. Hicks never followed up with the informant because she was reassigned to patrol the day after the ride-along.

Building a relationship with an informant can take months.  Building the relationship requires trust between the agent and the informant.  Before the informant can work, the agent must state in an affidavit that the informant has proved trustworthy.  When someone asks to become an informant, the officer must interview the individual and have him fill out paperwork. The agent must go over the paperwork with the potential informant and conduct an investigation on that person to verify his reliability and credibility.  Agents learn the intricate rules regarding

informants through field training.  According to Hicks, she was not aware whether she should return calls from informants after hours.  Windham testified that his informants do not contact him after hours, at his request.

## DISCUSSION

The plaintiff asserts in her complaint that the TPD (and, thus, the City of Tuscaloosa) violated her rights under (1) Title VII of the Civil Rights Act, (2) the Family and Medical Leave Act, and (3) the Fair Labor Standards Act, and that, because of these violations, she was constructively and discriminatorily discharged from her position at the TPD.  Each claim will be discussed in turn.

### Title VII

The plaintiff asserts in Counts II, III, and IV alleged violations of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq*.  The plaintiff claims that the TPD created a hostile work environment and discriminated against her on the bases of her sex and of her pregnancy.

#### *Count II – Gender Discrimination/Hostile Work Environment*

The defendant City of Tuscaloosa seeks summary judgment on plaintiff's claim that she was subjected to a hostile work environment while working at TPD.  Under Title VII, an employer is prohibited from subjecting an employee to a "discriminatory hostile or abusive environment."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).  In order to sustain a Title VII claim for harassment sufficient to create a hostile work environment, the plaintiff must demonstrate that: (1) she is a member of a protected group; (2) she has been subjected to unwelcome harassment (3) based upon her gender or ethnicity;

(4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there exists a basis for holding the employer liable.   See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999); Fortson v. Carlson, ___ F.3d ___, 2015 WL 4279223, at *4 (11th Cir. July 16, 2015). An employer is vicariously liable to a victimized employee when the hostile environment has been created by a supervisor "with immediate (or successively higher)" authority over the employee.   Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662, 689 (1998).   She must show that her workplace was permeated with discriminatory behavior that was sufficiently severe or pervasive to create a hostile or abusive working environment.   Id.   To be actionable, the environment must be both objectively and subjectively hostile, and whether the workplace may be deemed hostile "can be determined only by looking at all the circumstances."   Id. at 23.   The relevant factors include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."   Id.   It is not enough for the plaintiff to show that her workplace was offensive; rather, she must show that the TPD was so permeated with discriminatory intimidation, ridicule, and insult that a reasonable person would perceive the environment as hostile or abusive.   See Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1983).

The plaintiff belonged to a protected class as, during the time of the alleged harassment, she was a woman.   The plaintiff argues that the defendant subjected her to unwelcome harassment by wrongfully "writing-up" the plaintiff twice; demoting her, and making the decision to do so before she returned from maternity leave; limiting her training during her pregnancy; giving her a poor evaluation for the time period when she was on maternity leave;

demoting her without following protocol; conspiring to write her up and "get rid of her" for any reason; telling her she was "different" after her return from leave; saying "fuck her" when plaintiff had been crying; refusing to accommodate the plaintiff's breastfeeding as required by law; and failing to provide plaintiff with the proper safety equipment.  She claims this litany of harassment resulted in her constructive discharge.  (Doc. 1, p. 17).  Other than the adverse employment actions – the write ups, reassignment/demotion, and failure to provide safety equipment – the plaintiff mostly sets out conduct by Richardson that she claims created a hostile work environment.  The plaintiff further claims that Richardson's harassment was "clearly based on her pregnancy, breastfeeding and post-partum depression."  (Doc. 21, p. 77).  The plaintiff claims that Richardson: argued for the plaintiff to undergo training, be on-call, and otherwise be on full duty while pregnant; attempted to prevent the plaintiff from taking 12 weeks of leave by telling the plaintiff that she had not taken 12 weeks and that her duties were not limited while pregnant; complained that the plaintiff received preferential treatment when the plaintiff simply was following orders; forced the plaintiff to express milk in the locker room which was not sanitary or private; talked about the length of the plaintiff's leave to other employees; criticized Hicks by saying she had "changed" when she returned from leave; referred to the plaintiff as a "bitch" and a "cunt" because she took 12 weeks of leave; falsified "write-ups" and a poor quarterly evaluation of the plaintiff; conspired to "get rid of" the plaintiff; complained that the plaintiff would "disappear" when she was expressing milk and used these periods as justification to get the plaintiff reassigned; had the plaintiff work with an informant knowing that the plaintiff did not have the training to do so; and participated in the decision to reassign the plaintiff knowing that she would take a pay cut, lose her vehicle, have to work weekends and nights, and have to wear a vest while she was breastfeeding.

Title VII does not prohibit all verbal or physical workplace harassment.  Oncale, 523 U.S. at 80.  "The critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." 523 U.S. at 80, citing Harris, 510 U.S. at 25 (Ginsberg, J., concurring).  "In other words, an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes."  Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999).  "Personal animosity is not the equivalent of sex discrimination" and a plaintiff "cannot turn a personal feud into a sex discrimination case."  Succor v. Dade County School Board, 229 F.3d 1343, 1345 (11th Cir. 2000).  Requiring proof that the conduct complained of was sufficiently severe or pervasive to alter the conditions of employment and to create a "hostile or abusive" work environment "ensures that Title VII does not become a mere 'general civility code.'"  Gupta v. Florida Board of Regents, 212 F.3d 571, 583 (11th Cir. 2000).

To the extent the plaintiff alleges that Richardson called her names, talked to other employees about her, tried to convince the plaintiff to take fewer than 12 weeks of leave, or otherwise behaved unpleasantly or rudely toward the plaintiff, those action do not rise to the level of a hostile work environment.  They simply were not sufficiently severe or pervasive enough for an objectively reasonable person to conclude they were harassment.  With regard to the plaintiff's claims that Richardson wrote her up, plotted to get rid of her, gave her a poor evaluation, and otherwise trumped-up reasons to have her reassigned, the plaintiff seems to be conflating her hostile work environment claim with claims for discriminatory disparate treatment or retaliation.  Viewing all of the plaintiff's complaints in the light most favorable to her, the conduct was not so frequent, severe, pervasive, or threatening as to constitute an actionable

hostile work environment under Title VII.   While plaintiff's work relationship with Sgt. Richardson was unpleasant, it was not so "severe or pervasive" as to constitute an actionable hostile work environment.  Plaintiff agrees that before her maternity leave, her relationship with Sgt. Richardson was professional and respectful.  Upon her return, it may have been different, but not enough occurred during the eight days she returned to work to say that her working conditions were permeated with hostility and discrimination due to her female sex.  There is no evidence that any of the conduct was physically threatening or humiliating or more than simply offensive utterances. Consequently, because the plaintiff has failed to demonstrate that the conduct complained of was sufficiently "severe or pervasive" to support a Title VII action, and because the defendant's conduct did not "unreasonably interfere" with the plaintiff's job performance, the defendant's motion for summary judgment is due to be granted as it applies to the plaintiff's claim of a hostile work environment under Title VII.

### Count III – Gender Discrimination/Disparate Treatment

Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Specifically, the statute provides that it shall be unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

2 U.S.C. § 2000e-2(a)(1).  A plaintiff may prove a *prima facie* case of disparate-treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an

adverse employment action; (3) she is qualified to do the job; and (4) her employer treated similarly situated employees who are not members of the protected class more favorably.  See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  A disparate treatment claim requires proof of discriminatory intent, either through the use of direct or circumstantial evidence.  See, e.g., E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).

Under Title VII, a plaintiff asserting a disparate treatment claim must prove that the defendant had discriminatory intent either through direct or circumstantial evidence.  Denny v. City of Albany, 247 F.3d 1172, 1182 (11th Cir. 2001).  Direct evidence establishes that intent without the need for any inference or presumption.  Id. (quoting Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)).  Where there is no direct evidence, the plaintiff must prove intent in accordance with the method first set forth in McDonnel Douglas Corp. v. Green, 411 U.S. 792 (1973), and further refined in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  Hicks has not asserted direct evidence of disparate treatment.  Therefore, she must rely on the McDonnell Douglas/Burdine three-step, burden-shifting framework.  Under this framework, the plaintiff carries the initial burden of establishing a *prima facie* case of discrimination.  McDonnell Douglas, 411 U.S. at 802.  If a *prima facie* case is shown, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action taken against the plaintiff.  Id.  If this is done, the plaintiff may attempt to show that the proffered reason was merely a pretext, and that the defendant's true intent was discriminatory.  See Burdine, 450 U.S. at 253.

**A.  *Prima Facie Case***

To establish a *prima facie* case in accordance with the McDonnell Douglas framework, Hicks must show that (1) she is a member of a protected class, (2) she is qualified for her

position, (3) she suffered an adverse effect on her employment, and (4) she suffered from "differential application of work or disciplinary rules." Armstrong v. Flowers Hospital, Inc., 33 F.3d 1308, 1314 (11th Cir. 1994); McDonnell Douglas, 411 U.S. at 802. It is not disputed that the plaintiff is a member of protected class. She suffered the adverse employment action of being demoted from WANS to patrol, which resulted in a decrease in pay and the loss of a preferable day shift that did not include weekend work. The defendant argues, however, that the plaintiff was incapacitated due to post-partum depression and thus unable to do her job, making her "not qualified" for the WANS assignment.[7] Also, defendant contends that plaintiff cannot prove that her treatment was a "differential application of work rules" in that she has not identified any male counterpart treated more favorably in similar circumstances.

In the plaintiff's deposition, she testified regarding her post-partum depression:

Q.   You have told us that you had post-partum depression?
A.   Yes.
Q.   What symptoms were you having before you came back?
A.   I was having anxiety problems, problems focusing, problems breathing, sleeping.
Q.   Any other symptoms?
A.   I am sure there were other symptoms I spoke about with my doctor, you know of concentration, decision making, you know, I am probably not listing everything, but that's a general.
Q.   Was it serious?
A.   It was needed to be treated, but I was breast feeding and my physician didn't suggest I take any drugs while breast feeding.
Q.   Anti-depression drugs?
A.   Yes.
Q.   Well, not being able to focus and your decision making, do you know if that affected your ability to perform your job with the Task Force?

---

[7]   Insofar as the defendant contends that the plaintiff's return to patrol duties was not a "demotion," but a mere transfer, and therefore not an "adverse employment action," the reduction in pay suffered by plaintiff as a result of involuntarily losing her status as an investigator sufficiently established the adverse employment effect prong of the *prima facie* case.

A.     Yes.

Q.     Affected in a negative way - -

A.     If I make the wrong decision during that job, you could get yourself killed.

Q.     So you are agreeing with me?

A.     Yes.

Q.     So when you returned, were you actually able to perform all of the duties of an agent?

A.     Well, I had not been to the doctor the date I returned.

Q.     But you were having those symptoms though, right?

A.     Yes.

Q.     So were you physically able, mentally able to perform your job as an agent on the Task Force when you came back on November 26th of 2012?

A.     I am not at will to judge that, I guess, I mean - -

Q.     Well, do you know if you were or weren't?

A.     I mean I don't know, you know, what, I don't know how.  I know that Sergeant Richardson stated she knew something was different with me.  I didn't know there was anything wrong mentally, not seeing my doctor or knew what those symptoms meant.

. . .

Q.     But you understand looking back on it, you were acting differently when you returned than you were before you left, correct?

A.     Yes.

(Stephanie Hicks, Depo., Doc. 22-2, pp. 19-21).

        The records state, and the plaintiff alleges, that she was not diagnosed with post-partum depression until December 13, 2012, after she returned from maternity leave.  Accordingly, it was not known at the time of the adverse employment action (i.e., the transfer to patrol) that the plaintiff was suffering from post-partum depression.  Whatever decisions were made in early December were not based on any diagnosis or assessment of post-partum depression.  While there is evidence that Sgt. Richardson and others found plaintiff "different" from before her leave, less interested in her job, and even that Sgt. Richardson suspected that plaintiff was suffering from post-partum depression, there is no evidence that anyone concluded she was not

qualified to perform the WANS investigator job.  The written performance evaluations all found

that she met expectations with regard to it.  Furthermore, the defendant has not articulated why it

was perceived that the plaintiff would be able to perform the duties of a patrol officer but not

those of a WANS investigator.  The plaintiff testified that she felt her post-partum depression

was resolved in early 2013.  (Hicks, Depo., Doc. 22-2, p. 20).  None of the records regarding the

plaintiff's reassignment state that a reason for the reassignment was that the plaintiff was unable

to perform her duties.  Accordingly, the plaintiff has shown that there is at least a genuine issue

of fact as to whether she was qualified for her position.

Finally, the plaintiff must illustrate that she suffered from "differential application of

work or disciplinary rules."  Armstrong, 33 F.3d at 1314 (11th Cir. 1994).  The plaintiff has

asserted that her treatment was different from similarly situated male officers in the following

ways:

> 131.    No other male employee has been written up for failing to put gasoline in
> the car.[8]
> 133.    Male employees allowed other officers to drive the car or drove their car
> for personal reasons and were not reprimanded.
> 134.    Male officers were not demoted without due process.
> 135.    Male officers were given the proper safety equipment.
> 136.    Male officer were given proper and appropriate training.

(Doc. 1, p. 20).  The record evidence, viewed favorably to the non-moving plaintiff, supports

these allegations, but also shows that she was treated differently than other *female* officers as

---

[8]   The record indicates that the plaintiff actually was written up for failing to change the oil in her
assigned vehicle.  The maintenance supervisor testified that he had not heard of an officer, prior to the
plaintiff, being fired or reassigned based on failure to change the oil.  Several other officers testified that
they had not heard of another officer being reprimanded for failure to change the oil.

well.  For example, there is no evidence of any other WANS employee, male or female, being discipline for failing to get timely oil changes, while there is evidence that many officers, male and female, drove their vehicles beyond the mileage limits for oil changes without being disciplined.  There is evidence that all other officers in the WANS unit, male and female, were given full field training.  To the extent that a *prima facie* showing requires proof of differential treatment, plaintiff has shown that she was treated differently than other WANS employees, both male and female.  More importantly, however, there is no evidence of any other employee being *involuntarily* transferred out of the WANS unit.  Plaintiff was involuntarily stripped of her WANS assignment (and the benefits of the assignment) mere days after her return from maternity leave, during which her supervisor, Sgt. Richardson, expressed anger at plaintiff for taking twelve weeks of leave.  Thus, the plaintiff has presented sufficient evidence to create a *prima facie* case for disparate treatment in violation of Title VII.  Accordingly, the burden shifts to the defendant to assert a non-discriminatory reason for the plaintiff's reassignment.

### B.  Legitimate, Nondiscriminatory Reason

The defendant argues that the plaintiff was counseled regarding excessive warrants and failing to have her oil changed before her leave began, yet, repeat violations of these instructions were discovered while she was on leave.  The defendant further asserts that, although her quarterly evaluation was lower than her annual evaluation, the plaintiff still met the standards of employment.  The defendant argues that none of these actions—the informal counseling, the quarterly evaluation, and the transfer to patrol duties---were adverse employment actions.  The defendant also points out that, although the plaintiff contends that male employees were treated differently, she does not name any specific comparators who had issued excessive warrants or

who had failed to change the oil in their assigned vehicles without being counseled or evaluated similarly to the plaintiff.[9]

With regard to the plaintiff's demotion to patrol, the defendant asserts that she failed to take over the confidential informants that Brissie was working with before Brissie left on maternity leave in December, and that plaintiff would not return phone calls from confidential informants. Defendant also claims that, after returning from leave, the plaintiff was sent to ride with Coffee and spoke with his informant regarding certain illegal drug activity. The defendant claims that the plaintiff never followed up or sought warrants on the basis of the information supplied by the informant. The defendant further asserts that the plaintiff failed to attend important work events. The defendant argues that the short length of time the plaintiff was allowed before being reassigned out of the WANS task force was a matter of business judgment and, accordingly, should not be second-guessed by the court. Finally, the defendant states that the plaintiff put forth no evidence that any male or female agent was similarly situated to the plaintiff and treated differently.

### C. Pretext

The defendant having articulated several reasons for plaintiff's transfer to patrol, the burden shifts to the plaintiff to show that the legitimate, non-discriminatory reasons given by the defendant for her reassignment are pretextual. The main issue set out by the defendant is that the plaintiff failed to set forth a comparator. The Eleventh Circuit has stated that a plaintiff may

---

[9]   The court notes that these assertions by the defendant do not really state legitimate, non-discriminatory reasons for the actions taken against plaintiff; rather, they are attempts to show that the plaintiff cannot make out the *prima facie* showing for a disparate treatment claim. The court already has determined that plaintiff has shown a sufficient basis for finding that she suffered an adverse employment action when she was involuntarily transferred (demoted) from WANS and that she was treated differently from other WANS agents, male and female.

prevail on a gender discrimination claim without comparator evidence "if she presents sufficient evidence that would allow a jury to infer that . . . the decision-maker intentionally discriminated against her [because of her sex]." Galdamez v. DHL Air Exp. USA, 578 Fed. Appx. 887, 892 (11th Cir. 2014). In order to do so, the plaintiff "must present 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" Id. quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). "An inference[] is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact." Smith, 644 F.3d at 1328 n. 25 (quotation marks and alterations omitted).

In the instant case, the plaintiff's evidence is not sufficient to present the level of circumstantial evidence that would allow a jury to infer intentional sex discrimination by TPD with respect to her reassignment to patrol. The plaintiff has set forth evidence that may indicate that the reason for the plaintiff's reassignment was pretextual to the extent that she was reassigned in retaliation for using the full 12 weeks provided under the FMLA (which claim is discussed below). However, she has failed to show that any unfair or malicious treatment she suffered was on the basis of the fact that she is a woman. Accordingly, the defendant's Motion for Summary Judgment is due to be granted regarding the plaintiff's claim of disparate treatment under Title VII. This finding does not preclude the possibility that the plaintiff could raise an adequate claim under Title VII by relying on the Pregnancy Discrimination Act.[10]

---

[10] The court admits that a claim for sex discrimination and a claim for pregnancy discrimination become virtually indistinguishable. If an employee is subjected to disparate treatment due to her pregnancy or pregnancy-related conditions, it necessarily means that she has discriminated against because she is a woman. In this case, it appears to better focus the claims by acknowledging that, other than for her pregnancy and pregnancy-related conditions, there is no evidence that plaintiff was otherwise selected for discrimination due to being a woman. The

*Count IV – Pregnancy Discrimination*

In 1978, Congress passed the Pregnancy Discrimination Act ("PDA"), amending Title VII and providing that discrimination "because of sex" or "on the basis of sex" includes discrimination on the basis of pregnancy, childbirth, or related medical conditions. 42 U.S.C. § 2000e(k). Since the passage of the PDA, it has been established that pregnancy discrimination claims are analyzed using the same framework as other Title VII sex discrimination claims. See Armstrong v. Flowers Hospital, Inc., 33 F.3d 1308, 1312-13 (11th Cir. 1994). A plaintiff asserting disparate treatment under the PDA has the same burden of proof as one stating a disparate treatment claim based on sex under Title VII. She must prove that the defendant had discriminatory intent through direct or circumstantial evidence. Denny v. City of Albany, 247 F.3d 1172, 1182 (11th Cir. 2001). Direct evidence establishes that intent without the need for any inference or presumption. Id. (quoting Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)). Where there is no direct evidence, the plaintiff must prove intent in accordance with the method first set forth in McDonnel Douglas Corp. v. Green, 411 U.S. 792 (1973), and further refined in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). The Supreme Court recently confirmed this view:

> In our view, the [Pregnancy Discrimination] Act requires courts to consider the extent to which an employer's policy treats pregnant workers less favorably than it treats nonpregnant workers similar in their ability or inability to work. And here—as in all cases in which an individual plaintiff seeks to show disparate treatment through indirect evidence—it requires courts to consider any legitimate, nondiscriminatory, nonpretextual justification for these differences in treatment. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Ultimately the court must determine whether the nature of

---

plaintiff has pleaded a claim of pregnancy discrimination in a separate court, implying some distinction between sex-related discrimination and pregnancy discrimination. Because she pleaded them separately, the court will address them separately.

the employer's policy and the way in which it burdens pregnant women shows
that the employer has engaged in intentional discrimination.

Young v. United Parcel Service, Inc., ___ U.S. ___, 135 S. Ct. 1338, 1344, 191 L. Ed. 2d 279
(2015).

As will become clear below, it is useful to distinguish between pregnancy and childbirth, on the one hand, and "related medical conditions," on the other.  While the fact of pregnancy and childbirth are readily understandable, what constitutes a "related medical condition" is not so easy to define.  The statute itself does not define what constitutes a "related medical condition." The question presents itself here in the form of whether breastfeeding or expressing breast milk for feeding an infant can be considered "medical" conditions related to pregnancy and childbirth. As is discussed below, this is not a question without controversy and nuance.

### a).  Pregnancy as Basis of Discrimination

As with the plaintiff's disparate treatment claim, her evidence is not sufficient to present the level of circumstantial evidence that would allow a jury to infer intentional discrimination by TPD on the basis of her pregnancy itself.  Although the plaintiff has asserted that various aspects of her work and training were restricted during her pregnancy and that her lack of training later was used against her, she has not shown that the limitations themselves were discriminatory rather than for safety purposes.  She agreed to the limitations at the time and did not view them as discriminatory until after her return from maternity leave.  Rather, she viewed the pre-leave limitations on her duties while she was pregnant as an acceptable accommodation.  Thus, even under plaintiff's view of the evidence, if any discrimination occurred due to her pregnancy, it took place during and/or after her maternity leave, not while she worked in WANS prior to her leave.

There is no evidence that plaintiff suffered any adverse employment actions *during* her maternity leave.  She was not demoted, transferred, or disciplined during her leave.  While she points to her TPD-issued vehicle being taken away in September 2012, this resulted in no material change in her employment position, prestige, or compensation, and, therefore, was not an "adverse employment action" necessary for making a *prima facie* showing of disparate treatment.  At the time, she was on maternity leave and not using it for police business, and the defendant had every right to use its own vehicles for police business when plaintiff was not doing so.  That the TPD chose to retrieve a police vehicle not being used for police business is not indicative of discrimination due to pregnancy.

She also points to the alleged conspiracy to "write her up" while she was away on leave, but the evidence is clear that no write-ups or discipline occurred until after she returned from maternity leave.  While there is evidence that Sgt. Richardson expressed displeasure with the length of time plaintiff was taking for maternity leave, this alone resulted in no adverse employment actions against her.  Thus, there is no evidence that, because of her actual pregnancy, plaintiff suffered any actionable discrimination, at least during the time of her maternity leave.

The same cannot be said about her return to duty after her maternity leave and her involuntary transfer from WANS to patrol.  As the court has already determined, that transfer was a materially adverse employment action because it resulted in a less prestigious position and a reduction in compensation.  The question presented with respect to the transfer is whether there is substantial evidence that it was motivated by a discriminatory animus related to her pregnancy. The court believes there is sufficient circumstantial evidence to raise a genuine question of fact. There is evidence that Sgt. Richardson expressed her displeasure with the way plaintiff's

pregnancy was handled.  First, she believed that Capt. Snyder's accommodations of plaintiff's pregnancy demonstrated favoritism toward plaintiff and caused a morale problem among WANS agents.  Second, she told plaintiff that she did not believe plaintiff needed a full twelve weeks of maternity leave as she (Richardson) had not taken off that amount of time for births of her own two children.  While plaintiff was on maternity leave, Sgt. Richardson referred to plaintiff as a "cunt" and a "bitch,"  saying that she would write her up and run her off the WANS unit. Richardson discussed Hicks' maternity leave with other WANS agents, saying "[s]he thinks she gets twelve weeks, I know for a fact she only gets six weeks."  It was Sgt. Richardson who accused the plaintiff of not changing the oil in her police vehicle, and it was she who reported that plaintiff had been counseled about seeking an excessive number of warrants.  It was Sgt. Richardson who wrote-up the plaintiff for these violations when she returned from maternity leave and discussed with Capt. Robertson the desire to "get rid of the little bitch."  It was Sgt. Richardson who wrote the letter to Assistant Chief Dunn, requesting plaintiff's transfer back to patrol.  Although it appears to be true that the transfer decision belonged to Capt. Robertson, the WANS commander (subject to approval by Chief Anderson), he acted on the recommendations of Sgt. Richardson.   A reasonable jury could conclude that Sgt. Richardson resented the plaintiff's taking twelve weeks of maternity leave, and she began taking steps to remove plaintiff from WANS due to her pregnancy-related leave.

Although the defendant has articulated non-discriminatory reasons why plaintiff was reassigned to patrol, plaintiff has presented substantial evidence that the reasons were pretext for discrimination.   As discussed above, defendant contends that plaintiff came back to work unmotivated and "different," but Richardson and Robertson suspected that this was due to post-partum depression, a pregnancy-related medical condition.  Richardson at least was aware that

41

plaintiff had not received the field or school training that other WANS agents received and, therefore, was less prepared to deal with informants.  To the extent that the defendant asserts that plaintiff had repeat disciplinary violations for seeking excessive warrants and not having the oil changed in her vehicle, the plaintiff has offered evidence that there was no SOP setting guidelines for the number of warrants to seek and it was only Richardson who claimed (denied by plaintiff) to have counseled her about warrants.  Likewise, there is evidence that other WANS agents routinely failed to get timely oil changes in their police vehicles without being discipline.

Because there is a genuine issue of fact whether plaintiff's involuntary reassignment from WANS to patrol was motivated by a discriminatory animus related to her pregnancy, defendant's motion for summary judgment on this claim is denied.

### b.)  Post-partum Depression as Basis of Discrimination

Plaintiff alleges that, upon her return from maternity leave, she felt different, unfocused, anxious, and not sleeping.  Although she did not know it at the time, she was subsequently diagnosed as suffering from post-partum depression, for which she received treatment and that was resolved in early January 2013.  During the time between her return to work at WANS and her transfer to patrol, Sgt. Richardson and other members of WANS noticed that plaintiff was different, seeming to have a lack of interest in her job.  Richardson suspected plaintiff was suffering from post-partum depression and Capt. Robertson suggested that plaintiff contact the TPD Employee Assistance Program if she had post-partum depression.  Richardson already had expressed anger toward plaintiff for taking twelve week of leave, and had referred to her as "cunt" and a "bitch" during plaintiff's leave.  On the first day of her return to work on November 26, 2012, plaintiff overheard Richardson and Robertson discussing wanting to "get rid of that little bitch" and that they would find "any way" they could to do so.  Only eight work

days after her return to WANS, Richardson wrote a letter to Assistant Chief Dunn on December 7, 2012, explaining why plaintiff should be transferred from WANS back to patrol. In the letter, Richardson suggested that plaintiff lacked initiative and motivation to learn and improve her job performance, and that plaintiff was "un-involved in the activities of" of the WANS unit.

There is no serious question that post-partum depression is a "medical condition" related to pregnancy and childbirth. Unlike the debate that may exist around whether breastfeeding is a "medical" condition, it cannot be seriously questioned that post-partum depression is a medical condition. There is evidence in the record from which a reasonable jury could find that Sgt. Richardson and Capt. Robertson orchestrated plaintiff's reassignment to patrol duties because they found her "different" emotionally upon her return to WANS after the birth of her child. Both Robertson and Richardson suspected that plaintiff was suffering from post-partum depression, even though it had not yet been recognized by plaintiff or diagnosed by a medical professional. Nevertheless, in the words of Sgt. Richardson's December 7 letter, they used her "changed" motivation and lack of "initiative and motivation" as part of the basis for having her involuntarily reassigned. They pointed out that she was "un-involved in the activities" of the WANS unit, all of which is suggestive of the depression they suspected she suffered. In effect, believing that she suffered from post-partum depression (which, in fact, was diagnosed later, after plaintiff's reassignment), plaintiff's supervisors used her pregnancy-related medical condition to have her reassigned out of WANS. Because a reasonable jury could reach this conclusion from the evidence, plaintiff has stated and shown a *prima facie* case of discrimination based upon her pregnancy-related medical condition of post-partum depression with respect to her involuntary reassignment to patrol duties.

By contrast, the plaintiff has *not* established that her alleged constructive discharge on January 4, 2013, was the product of pregnancy-related discrimination arising from her post-partum depression.  After her reassignment on December 7, 2013, Hicks sought help from EAP for counseling on December 12, 2013, and on December 13, 2012, she was diagnosed with post-partum depression.  She was experiencing difficulty breathing, sleeping, and focusing, and was suffering with anxiety.  Hicks' doctor recommended that she take time off, and plaintiff requested leave from December 13, 2012, through January 2, 2013, which was granted by the City.  Thus, there is no evidence that, other than her involuntary reassignment to patrol duties, plaintiff suffered any other adverse employment action related to her post-partum depression. The defendant City granted her request for leave for several weeks to deal with her depression, and it provided counseling services through the Employee Assistance Program.  Her alleged constructive discharge on January 4 had nothing to do with her prior depression, but was entirely related to her requests for accommodations for breastfeeding.  When she was prepared to return to work, the City did nothing to subject her to an adverse employment action because she had taken time off to deal with depression.  The plaintiff can proceed with her pregnancy discrimination claim, insofar as it arises from her post-partum depression, only as it relates to her involuntary reassignment from WANS to patrol.  On this basis, the defendant's motion for summary judgment as to plaintiff's pregnancy discrimination claim will be denied.

c). *Breastfeeding or Expressing Breast Milk as Basis of Discrimination*

The protections against pregnancy discrimination do not end with the pregnancy itself; pregnancy discrimination also can be based on medical conditions related to pregnancy.  Here, plaintiff alleges that she was the victim of discrimination on the basis that, after her return from maternity leave, she was breastfeeding her child and expressing breast milk for feeding.

Whether breastfeeding or expressing breast milk constitutes a "related *medical* condition" to pregnancy for purposes of Title VII is a controversial issue to which the courts have taken a nuanced approach.

The Fifth Circuit determined, in Equal Employment Opportunity Commission v. Houston Funding II, Ltd., that the allegation that a woman's employment was terminated because she was lactating or expressing breast milk was sufficient to assert a sex-discrimination claim under Title VII because "lactation is a related medical condition of pregnancy for purposes of the PDA." 717 F.3d 425, 428 (5th Cir. 2013). The court agrees that lactating is a medical condition related to pregnancy and childbirth, and that a lactating employee may not be treated differently in the workplace from other employees with similar abilities to work. Thus, a female employee may not be discharged or otherwise disciplined simply because she is lactating.

The question becomes more difficult when the lactating employee claims discrimination because she was not provided an accommodation to enable her to breastfeed or express milk while still performing her job. For example, the Fifth Circuit in EEOC v. Houston Funding explained in a footnote that several cases have concluded that the PDA does not require that breastfeeding employees be given special accommodation to enable them to breastfeed or express milk. The court said:

> The cases the defendants cite in arguing that lactation is not a medical condition are distinguishable on several grounds. Notably, most of these cases involved claims that the employer did not appropriately accommodate a female employee who wanted to use a breast pump at work. See Martinez v. N.B.C., Inc., 49 F.Supp.2d 305, 308–10 (S.D.N.Y.1999) (pregnancy and related medical conditions are not "disabilities" for purposes of the Americans with Disabilities Act, and the employer did not need to accommodate the plaintiff's desire to use a breast pump in the workplace); Urbano v. Cont'l Airlines, Inc., 138 F.3d 204, 207 (5th Cir.1998) (the PDA does not require special treatment based upon

pregnancy); <u>Falk v. City of Glendale</u>, No. 12–cv–00925–JKL, 2012 WL 2390556, at *4 (D.Colo. June 25, 2012) (the PDA does not compel employers to affirmatively provide accommodations, and the plaintiff failed to allege differential treatment); <u>Vachon v. R.M. Davis, Inc.</u>, No. 03–234–P–H, 2004 WL 1146630, at *10 (D.Me. Apr. 13, 2004) (the plaintiff failed to allege an adverse employment action when she asserted only that her employer did not provide sufficient accommodations for breastfeeding); <u>Wallace v. Pyro Mining Co.</u>, 789 F.Supp. 867, 869 (W.D.Ky. 1990) (the PDA does not require an employer to grant additional leave to a woman wishing to stay home to breastfeed her child). The issue here is not whether Venters was entitled to special accommodations—at the time, she was not entitled to special accommodations under Title VII—but, rather, whether Houston Funding took an adverse employment action against her, namely, discharging her, because she was lactating and expressing breast milk.

<u>E.E.O.C. v. Houston Funding II, Ltd.</u>, 717 F.3d 425, 430 n. 6 (5th Cir. 2013). Furthermore, in a separate footnote, the Fifth Circuit went on to emphasize that accommodations need not be made for breastfeeding or expressing milk:

> The record before us reflects that Venters asked Cagle whether she would be permitted to use a breast pump while at work. The record also shows that Cagle demonstrated hostility toward such an accommodation. In its motion for summary judgment, Houston Funding contended Venters was fired because she inquired about whether she would be allowed to use a breast pump. Simply posing this question is not alleged to be a terminable offense. *But nothing in this opinion should be interpreted as precluding an employer's defense that it fired an employee because that employee demanded accommodations.*

<u>Id.</u> at 430 n. 7 (5th Cir. 2013). Indeed, the concurring opinion by Judge Jones confirms that "[t]he panel opinion does not cast doubt on the holdings of those cases rejecting... claims [of women who wanted to use a breast pump at work]" and that "if [plaintiff] intended to request special facilities or down time during work to pump or 'express' breast milk, she would not have a claim under Title VII or the PDA...." <u>Id.</u> at 430 (Jones, J., concurring); <u>see also</u> <u>Wilson v. Ontario County Sheriff's Dep't</u>, 2014 WL 3894493, at *8 (W.D.N.Y. Aug. 8, 2014). Although there is no Eleventh Circuit precedent, courts faced with similar issues since <u>Houston Funding</u>

have summarized the rule of law this way: "Where a plaintiff's claim focuses on adverse employment actions or conditions relating to her lactation breaks, as opposed to an alleged failure to accommodate a disability, an employer may be liable under Title VII." E.E.O.C. v. Vamco Sheet Metals, Inc., 2014 WL 2619812, at *6 (S.D.N.Y. June 5, 2014); Lara-Woodcock v. United Air Lines, Inc., 999 F. Supp. 2d 1027, 1045 (N.D. Ill. 2013) ("A number of courts have concluded that an employer is not required to offer additional accommodations for breastfeeding under Title VII or the PDA, beyond those offered to other employees who need to tend to personal needs at work."); but see Martin v. Canon Business Solutions, Inc., 2013 WL 4838913, at *8 (D. Colo. Sept. 10, 2013) (holding that employer's denial of "access to facilities to express breast milk is relevant to whether Defendant discriminated against [plaintiff] based on her pregnancy."). This understanding of the rule seems consistent with the Supreme Court's general observation about the PDA in Young, that the "Act requires courts to consider the extent to which an employer's policy treats pregnant workers less favorably than it treats nonpregnant workers similar in their ability or inability to work." Young v. United Parcel Service, Inc., ___ U.S. ___, 135 S. Ct. 1338, 1344, 191 L. Ed. 2d 279 (2015). Thus, under the PDA, an employer is not required to treat breastfeeding or lactating employees *better* that it would treat non-lactating employees under similar circumstances, as long as it does not treat them worse.

There is evidence that plaintiff suffered pregnancy-related discrimination arising from breastfeeding. As will be discussed further *infra*, the plaintiff has asserted that while she was in WANS she was denied a private location to breastfeed or express breast milk as required by the FLSA, and that after she was transferred to patrol she was not provided with sufficient accommodations to allow her to breastfeed her child and safely perform her job while breastfeeding. Specifically, the plaintiff claims that she was not allowed to take the position at

the patrol desk while breastfeeding and that being assigned a beat on patrol required her either to wear a vest and risk a loss of milk production and infections, or forgo wearing a vest or wear an improperly fitted vest, either of which was potentially dangerous.  The court will address these claims in turn.

Upon her return to work with WANS, plaintiff reported to Richardson and Robertson that she needed a place to breastfeed her child or to express milk for use later.  They suggested that she use the female locker room to do so.  When she requested the use of a records room, they refused.  The refusal to provide a special accommodation not made available to other employees is not actionable under the PDA, and there is no evidence that plaintiff was denied any facility or opportunity available to other WANS employees.  It appears to be undisputed that plaintiff was allowed to use the female locker room and, on occasion, take her lunch break to express milk at home.  There is no evidence that she was disciplined or reassigned as a result of breastfeeding or expressing milk while on WANS.  Richardson told Hicks that she did not have to "note on the board" when she took a break to express milk.  Plaintiff's evidence fails to establish any discrimination under the PDA with respect to breastfeeding or lactating while working with WANS.

Following her reassignment to patrol, plaintiff contends that she was constructively discharged because she was breastfeeding and lactating.  She argues that her doctor advised her not to wear a snug-fitting ballistics vest while lactating and the TPD refused to allow her to work a desk job while lactating to avoid the having to choose between not breastfeeding or patrolling without a ballistics vest or with an ill-fitting one.

The TPD PGO regarding ballistic vests states that "[a]ll body armor issued must comply with protective and related requirements prescribed under current standards of the National

Institute of Justice," and that "[o]fficers that are assigned to a uniformed function . . . are required to wear body armor while engaged in field activities on duty unless. . . . a City of Tuscaloosa-approved physician determines that an officer has a medical condition that would preclude wearing body armor" or "the department determines that circumstances make it inappropriate to mandate wearing body armor."  (Doc. 26-5, p. 1).  The defendant argues that, based upon these exceptions, it was acceptable for the TPD to put the plaintiff on patrol and allow her to choose either to wear a larger vest or not to wear a vest at all.  Also, the TPD offered to assign plaintiff to the "Riverside" patrol beat, which included City Hall where two lactation rooms were located.  There is evidence in the record, however, that other patrol officers have been temporarily assigned to a desk job for medically related conditions, an accommodation the City declined to provide plaintiff while she was breastfeeding.  The evidence in the record makes plain that the TPD requires patrol officers to wear a ballistic vest unless excused by a doctor.  Even so, the evidence shows that virtually every patrol officer wears a vest because going without is dangerous.  The offer to allow plaintiff to patrol without a vest was essentially no accommodation at all given the danger of patrol duties without one.[11]  A reasonable jury could conclude that, given the dangers of patrolling without a vest and the TPD's unwillingness to give her a temporary desk assignment while breastfeeding, plaintiff was left with no choice but to resign.  She could not reasonably do her patrol duties safely, as other patrol officers could, without wearing a properly fitting ballistics vest, but she could not wear the vest while lactating.

---

[11]   Plaintiff also contends that, even if she went on patrol without a vest, there was no way to guarantee that she would be able to take a break from her patrol duties when necessary to express breast milk.  She insisted upon a written guarantee that she would be accorded regular breaks to express milk.  This, however, amounts to a special accommodation, which, as noted, the PDA does not require.

In the face of the City's refusal to allow her to work temporarily on the patrol desk, there was no job left that plaintiff could perform.  She was, in effect, constructively discharged.

Accordingly, the plaintiff has presented sufficient facts to withstand the defendant's motion for summary judgment regarding her pregnancy discrimination claim, and the motion is due to be denied.


### FMLA

The plaintiff asserts in Counts I and VI that the defendant City interfered with her rights under the Family and Medical Leave Act ("FMLA").  Eligible employees are entitled under the FMLA to twelve workweeks of unpaid leave per year for, among other things, "the birth of a son or daughter of the employee and in order to care for such son or daughter."  29 U.S.C. § 2612(a)(1).  Upon return from leave, the eligible employee is entitled to be restored to her previous position or to a position that is equivalent in terms of "employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).  Employers are prohibited from interfering with the eligible employee's exercise of her rights under the statute.  29 U.S.C. § 2615.  Two types of claims arise under the FMLA: (1) interference claims, where an employer denies or limits the employee's right to such leave, and (2) retaliation claims, where an employer retaliates against an employee who requests or takes such leave.  See Penaloza v. Target Corp., 549 Fed. Appx. 844, 847 (11th Cir. 2013).  The defendant moves to dismiss the plaintiff's claims that TPD improperly interfered with her FMLA rights and retaliated against her for her use of her FMLA rights.

### A. Count I – Interference

To state a claim for interference with FMLA leave, a plaintiff must demonstrate that she was entitled to a benefit under the FMLA, which was denied.  Drago v. Jenne, 453 F.3d 1301, 1306 (11th Cir. 2006); 29 U.S.C. § 2615(a)(1) (prohibiting any employer from "interfer[ing] with, restrain[ing] or deny[ing] the exercise of or the attempt to exercise, any right provided under" the FMLA).  Refusing to authorize FMLA leave is not the only way in which an employer can interfere with an employee's rights under the Act.  The defendant argues that the plaintiff has not alleged any right granted under FMLA that she did not receive, contending that the plaintiff's leave was approved and she was restored to her previous position on WANS upon her return from leave.  Even if the plaintiff were not restored to her previous position upon return from leave, the defendant argues that she was not entitled to restoration because she took more than the twelve weeks of leave allowed under the FMLA.

In the plaintiff's leave application, which was titled "Application for Family or Medical Leave of Absence," the plaintiff estimated her start and return dates as August 20, 2012, and November 12, 2012, respectively.  (Doc. 23-7).  The plaintiff, however, actually was on leave from August 23, 2012, to November 26, 2012, a total of just over 13 weeks.  The plaintiff explains this by stating that she took three days of *paid* leave due to her child's sickness, and she was not scheduled to work November 22 to 25, which were holidays and weekend days.  Once these days of paid leave and holidays are subtracted from the total time plaintiff was away from work, the remaining leave was consistent with twelve weeks of FMLA leave.

The Eleventh Circuit noted in McGregor v. AutoZone, Inc., that

The statute does not suggest that the 12 week entitlement may be extended. Where Congress wanted explicit notice provision with significant consequences,

it provided for them.   29 U.S.C. § 2613 (detailing notice requirements for employees seeking leave); 29 U.S.C. § 2614 (employer may deny restoration to highly compensated employee if "the employer notifies the employee of the intent to deny restoration on such basis at the time the employer determines that such injury would occur").

The regulations not only add requirements and grant entitlements beyond those of the statute but they also are inconsistent with the stated purpose of the statute. One of the explicit purposes of the Act is to "balance the demands of the workplace with the needs of families . . . in a manner that accommodates the legitimate interests of employers."   29 U.S.C. § 2601(b)(3); *see also* 29 U.S.C. § 2653 ("Nothing in this Act or any amendment made by this Act shall be construed to discourage employers from adopting or retaining leave policies more generous than any polices that comply with the requirements under this Act"). Where an employer such as defendant exceeds the baseline 12 weeks by providing not only more leave than FMLA but also paid leave, the employer should not find itself sued for violating FMLA.

180 F.3d 1305, 1308 (11th Cir. 1999).  McGregor is distinguishable from the instant case, however, because the plaintiff in McGregor made the argument that her employer was required to notify her that her FMLA leave was running concurrently with short-term disability leave. The plaintiff in the instant case makes no such argument.  The plaintiff claims that she took three days of paid leave after her FMLA leave ran out, and then returned to work on her next scheduled work day, November 26, 2012.  Furthermore, none of the paperwork surrounding the plaintiff's counseling or reassignment notes as a reason for the action that the plaintiff failed to return to work when she was supposed to.  Thus, defendant's argument that plaintiff forfeited her right to return to her previous position because she took more than the allotted twelve weeks of leave is meritless.

To the extent the defendant argues that the plaintiff was properly restored to her previous position, the argument fails.  Although the plaintiff did return as a WANS investigator, she was reassigned to a position with less pay and less desirable hours after having worked only seven

full days after returning from leave.[12]  The plaintiff argues that the post-FMLA reinstatement was illusory because the plaintiff was not given a reasonable amount of time to make progress or fail to make progress on the notes she was given in the November 26 meeting and on her quarterly review.  This court agrees.  If the plaintiff is entitled to be reinstated to the same or a similar position, that reinstatement must be meaningful.  If employers are allowed to provide a mere cursory reinstatement for only a few days to comply with the law before demoting an employee returning from FMLA leave, the spirit of the law is circumvented and the protection the FMLA provides is stripped away.

Also, it must be recalled, viewing the evidence favorably to the nonmoving plaintiff, that Sgt. Richardson expressed vehement objection to plaintiff's use of twelve weeks of leave, saying that she was entitled only to six weeks.  Even while plaintiff was on leave, Sgt. Richardson made comments to other WANS agents expressing opposition to plaintiff's use of the leave.  This evidence demonstrates that the supervisor intimately involved in the decision to reassign plaintiff to patrol duties was opposed to her full utilization of her rights under the FMLA.

Accordingly, the plaintiff has alleged sufficient facts to support a claim of interference with the FMLA right to reinstatement, and the defendant's motion for summary judgment regarding that claim is due to be denied.

---

[12]   The plaintiff was reassigned on December 7, 2012.  She returned to work on November 26, 2012, took paid leave on November 28 and December 5, and was not scheduled to work weekends.  Only nine workdays elapsed between the plaintiff's return and her reassignment, and she was off for two of those days.

## B.  Count VI - Retaliation[13]

To establish a claim for retaliation under the FMLA, a plaintiff must meet essentially the same elements of any Title VII retaliation claim.  Krutzig v. Pulte Home Corp., 602 F3d 1231, 1234-35 (11th Cir. 2010).  She must demonstrate that the employer took an adverse employment action against her, which was motivated by a retaliatory animus and which was causally connected to her use of the FMLA.  Penaloza v. Target Corp., 549 Fed. Appx. 844, 847 (11th Cir. 2013).  The plaintiff must show that: "(1)[s]he availed [her]self of a protected right under the FMLA, (2) [s]he suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision."  Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001), quoting Parris v. Miami Herald Publishing Co., 216 F.3d 1298, 1301 (11th Cir. 2000).  If the plaintiff succeeds in setting out a prima facie case, the burden shifts to the defendant to demonstrate a legitimate, non-retaliatory reason for the adverse employment action.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d. 668 (1973), See Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006).  If the defendant is able to meet this hurdle, the burden shifts back to the plaintiff to show that the proffered reason for the adverse employment action was pretextual. See Id.

### 1.  Prima Facie Case

It is not disputed that the plaintiff availed herself of twelve weeks of leave to which she was entitled under the FMLA.  The plaintiff asserts that she suffered the adverse employment action of demotion and, later, constructive termination.  The defendant asserts that the plaintiff's

---

[13]   The plaintiff's FMLA Retaliation claim is designated as Count V in the Complaint.  However, this appears to be a typographical error.  Accordingly, the claim will be designated as Count VI for purposes of this Order.

reassignment to patrol from WANS was not a demotion or an adverse employment action but simply a reassignment.  The court already has rejected this assertion, given that the reassignment also resulted in a reduction in plaintiff's pay.  Moreover, adverse employment actions are not "limited to discriminatory actions that affect the terms and conditions of employment." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (addressing Title VII's antiretaliation provision).  The Supreme Court further set out in Burlington that "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position considering all the circumstances."  Id. at 71, 126 S. Ct. 2405 (internal quotation marks omitted).  The Eleventh Circuit has presumed that the reasoning in Burlington also applies to FMLA retaliation claims.  Foshee v. Ascension Health-IS, Inc., 384 Fed. Appx. 890, 891-92 (11th Cir. 2010) (per curiam).

Taking the facts in the light most favorable to the nonmoving party, the plaintiff's transfer from WANS to patrol was an involuntary demotion and an adverse employment action. The transfer resulted in a decrease in pay as well as a change in schedule that made the plaintiff eligible to work nights and weekends where she previously was working only a day shift during the week.  Although the plaintiff's demotion was not a revocation of her employment, it did affect the conditions of her employment, and a reasonable jury could determine that the demotion was materially adverse to the plaintiff.  Accordingly, the plaintiff meets step two in establishing a prima facie case of retaliation.  Whether or not the plaintiff can show she was constructively discharged, to be discussed infra, her reassignment from WANS to patrol was an adverse employment action.

Finally, the plaintiff must show a causal connection between her demotion and her FMLA leave.

> To establish the causal connection element, "a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'" Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999) (quoting Simmons v. Camden County Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985)). In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action. See Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993); Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression. . . ."). That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him. As with most facts, the defendant's awareness can be established by circumstantial evidence. See Goldsmith, 996 F.2d at 1163.

> The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection. See Gupta, 212 F.3d at 590; Bechtel Constr. Co. v. Secretary of Labor, 50 F.3d 926, 934 (11th Cir. 1995) ("Proximity in time is sufficient to raise an inference of causation.") However, there is this exception: temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct. See Clover, 176 F.3d at 1355-56.

Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000). The plaintiff was reassigned to patrol on December 7, 2012, the ninth work day after she returned to work from her FMLA leave. The temporal proximity alone is sufficient to show that the plaintiff taking leave and her adverse employment action were not entirely unrelated. Further, there is no argument that any decisionmaker involved in the plaintiff's reassignment did not know that she had taken leave under FMLA. Chief Anderson was the person who informed the plaintiff that she was being reassigned, and her FMLA application was signed by Anderson and Robertson,

her direct supervisor.  Certainly Robertson and Richardson, to the extent they participated in the reassignment decision, were fully aware that she had taken twelve weeks of leave.

The defendant argues that in order for temporal proximity to form the basis of a causal connection, the adverse action must occur less than three months from the *request* for leave.  The case law cited by the defendant does not support that assertion, however.  The underlying Eleventh Circuit case regarding temporal proximity is Thomas v. Cooper Lighting, Inc., 506 F.3d 1361 (11th Cir. 2007), in which the Eleventh Circuit states as follows:

> The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. See Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 798-99 (11th Cir. 2000). But mere temporal proximity, without more, must be "very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) (internal citations omitted). A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough. *See id.* (citing *Richmond v. ONEOK,* 120 F.3d 205, 209 (10th Cir.1997) (3 month period insufficient) and Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir.1992) (4 month period insufficient)). Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law. *See Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir. 2004) (citing Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001)).

Thomas, 506 F.3d at 1364.  In Thomas, the plaintiff complained of sexual harassment in April 2005, and her employment was terminated in July 2005.  In the instant case, the plaintiff was demoted more than three months after she filed her request for FMLA leave, but a mere nine days after she returned from leave.  This court's reading of Thomas does not support the defendant's assertion that the application for leave itself is the only proper measuring point for temporal proximity.  The plaintiff's use of her FMLA leave is the protected activity in question,

and a nine day disparity between her use of leave and the adverse employment action is sufficiently close in temporal proximity to suggest causation. The defendant's argument that the retaliation must occur less than two or three months after the *request* for FMLA leave completely eviscerates the temporal proximity doctrine. Because FMLA leave can last up to twelve weeks (approximately three months), under defendant's argument an employer would be free to retaliate against an employee the very first day back from leave without any inference of retaliation. That defies common sense. A rational inference of retaliation can be drawn just as much (perhaps more so) from adverse employment actions take soon after an employee returns from FMLA leave as from the date the employee first requests it. Thus, the plaintiff has put forth a *prima facie* case for retaliation.

### 2. *Legitimate Cause*

When the plaintiff sets forth a *prima facie* showing of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. The defendant asserts the legitimate reason for the plaintiff's reassignment was because she failed to adequately perform her duties in WANS. For example, the defendant claims that the plaintiff failed to appropriately work with informants and failed to follow procedure for acquiring warrants. The plaintiff's quarterly evaluation from the period of July 1, 2012 to September 30, 2012, ranks the plaintiff's job knowledge as unsatisfactory and her judgment, initiative, dependability, and work quality only as fair. (Doc. 24-3).

In a letter to Chief Dunn dated December 7, 2012, Richardson requested that the plaintiff be removed from her position in WANS "[b]ecause Agent Hicks has not shown any effort in better[ing] herself or moving in the new direction of this unit." (Doc. 24-8, p. 4). Richardson asserted that the plaintiff did not make the progress she should have over the year she was in

58

WANS.  In the letter, Richardson cited the plaintiff's failure to return her phone call regarding her husband's use of her assigned vehicle.  Richardson also alleged that the plaintiff failed to properly work with informants.

### 3. *Pretext*

Once the defendant presents a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the stated reason was a pretext for retaliation.  To show pretext, the plaintiff must present evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Hurlbert v. St. Mary's Health Care System, Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) (internal quotations omitted); quoting Chapman v. Al Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc); quoting in turn Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).  Pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Jackson v. State of Alabama State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005); quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981).

In the instant case, the plaintiff has put forth evidence to show that the proffered explanation for her reassignment and demotion – that she did not adequately perform her duties and was not motivated to do so – was pretextual.  The plaintiff asserts that, after her counseling and "write-up" on November 26, 2012, she overheard Richardson and Robertson having a discussion about her in which they said they wanted to "get rid of that little bitch" and that they would find "any way" they could to do so.  (Doc. 21, p. 29).  At that time, Richardson was the

plaintiff's supervisor, and Robertson had previously been her supervisor.   Although Chief Anderson, not Robertson, reassigned the plaintiff, Anderson testified that Robertson recommended to him that the plaintiff be reassigned and that he "upheld the recommendation." (Anderson, depo., Doc. 29-7, p. 3).   Furthermore, the plaintiff asserts that Richardson was overheard speaking with a group of WANS employees and stating that the plaintiff "thinks she gets twelve weeks, I know for a fact she only gets six weeks."  (Doc. 21, p. 40).  The plaintiff also points to discrepancies between the annual evaluation she received prior to taking maternity leave in which she was ranked "exceeds expectations" or "greatly exceeds expectations" in all categories, and "exceeds expectations" in overall job performance and the quarterly evaluation she received after she returned from FMLA leave in which she was ranked markedly lower and received only "meets standards" in her overall evaluation.  (Docs. 23-8, 24-3).  Further, upon her return from leave, both Richardson and Robertson suspected she was suffering from post-partum depression, yet they did not mention this fact in the December 7 letter justifying her reassignment.  They also did not mention that she had not been fully trained.  Taking the facts as presented by plaintiff, Richardson personally knew that she had not trained plaintiff because Richardson was undergoing physical therapy during the time plaintiff was supposed to be trained.

Given the fact that the plaintiff met her initial burden of establishing a *prima facie* case for retaliation, and the requirement that the court take the evidence in the light most favorable to the nonmoving party, the plaintiff has presented sufficient evidence to establish a triable issue as to whether the defendant retaliated against the plaintiff for taking her FMLA protected leave. Accordingly, the defendant's Motion for Summary Judgment regarding the plaintiff's FMLA retaliation claims is due to be denied.

**FLSA**

The plaintiff alleges in Count V of her Complaint that the TPD violated her rights under the Fair Labor Standards Act ("FLSA") with respect to breastfeeding and expressing milk. The Fair Labor Standards Act requires that employers shall provide:

> (A) a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and
>
> (B) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

29 U.S.C. § 207(r)(1). The plaintiff argues that she was not provided a private place to express breast milk. Upon her return to work, the plaintiff was told that she could use the locker room because the police station did not have private lactation rooms like the two at City Hall. The plaintiff asked to use the records room, but was not allowed to do so. The plaintiff claims that each time she used the locker room to express breast milk she was interrupted by female coworkers or members of the public.

The defendant cites the fact that the City Hall lactation rooms exist to show that the plaintiff had adequate privacy to pump breast milk. However, City Hall was not the plaintiff's primary place of work before she was reassigned from WANS to patrol. Even if she had reported to work the beat assigned to her as a patrol officer, she would not be at City Hall or able to go to City Hall any time she needed to express breast milk. The defendant also cites the fact that, on occasion, the plaintiff was able to return home to pump. The plaintiff claims in her statement of facts that she used her lunch hour to do so. In any case, the fact that the plaintiff could "work-around" the fact that she was not provided a private place to pump at her place of

work does not absolve the defendant of its failure to provide her with such a location, as required by the FLSA.

The defendant further argues that, even if the plaintiff was deprived of her rights under § 207 of the FLSA, she has not alleged appropriate damages for recovery under the FLSA.  The only available elements of damage under the FLSA are unpaid minimum or overtime wages, plus an equal amount of liquidated damages.  29 U.S.C. §216(b).  The defendant claims that there is no evidence the plaintiff was denied pay while she was expressing milk, so the plaintiff has not asserted damages collectable under her FLSA claim.  Further, the defendant argues, there is no private right of action under § 207(r)(1).  The Eleventh Circuit came just shy of addressing the issue in Miller v. Roche Surety And Casualty. Co., Inc., 502 Fed. Appx. 891, 893 (11th Cir. 2012), stating that because the defendant did not violate § 207(r)(1), "we need not decide the issue of damages."

The FLSA sets out penalties for violation of its provision in section 216:

> (b) Damages; right of action; attorney's fees and costs; termination of right of action
>
> Any employer who violates the provisions of section 206 or 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. . . . An action to recover the liability prescribed . . . may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. . . . The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action. . . .

29 U.S.C. § 216(b).  However, the FLSA specifically notes that "[a]n employer shall not be required to compensate an employee receiving reasonable break time [to express breast milk] for

any work time spent for such purpose." 29 U.S.C. § 207(r)(2).  No alternative right to damages

beyond minimum wages or overtime pay is provided for plaintiffs asserting a right under

§ 207(r)(1).  Accordingly, § 216(b) renders § 207(r)(1) virtually useless in almost all practical

application.  The toothlessness of § 207(r)(1) was acknowledged by the Department of Labor in

its Notice regarding § 207(r)(1), issued on December 21, 2010.  <u>Reasonable Break Time for</u>

<u>Nursing Mothers</u>, 75 FR 80073-01.  In regard to the enforcement of § 207(r)(1), the Department

of Labor stated the following:

> Section 7(r) of the FLSA does not specify any penalties if an employer is found to
> have violated the break time for nursing mothers requirement.  In most instances,
> an employee may only bring an action for unpaid minimum wages or unpaid
> overtime compensation and an additional equal amount in liquidated damages.  29
> U.S.C. 216(b).  Because employers are not required to compensate employees for
> break time to express breast milk, in most circumstances there will not be any
> unpaid minimum wage or overtime compensation associated with the failure to
> provide such breaks.
>
> If an employer refuses to comply the with the requirements of section 7(r),
> however, the Department may seek injunctive relief in federal district court, and
> may obtain reinstatement and lost wages for the employees.  29 U.S.C. 217.  For
> example, if an employer terminates a nursing mother employee because she takes
> breaks to express milk that she is entitled to under the FLSA, or because she has
> informed her employer that she intends to take breaks to express breast milk, this
> would be considered a violation of 29 U.S.C. 15(a)(2) (i.e., an unlawful violation
> of section 7(r)).  In such a case, the Department could pursue injunctive relief in
> federal district court and seek reinstatement and lost wages for the employee.

<u>Reasonable Break Time for Nursing Mothers</u>, 75 FR 80073-01, 80078 (December 21, 2010).

The plaintiff states in her complaint that she was forced to take sick leave to

accommodate her breastfeeding, and was constructively discharged, resulting in lost wages and

benefits.  (Doc. 1, ¶ 160).  The plaintiff further asserts in her response to the defendant's Motion

for Summary Judgment that,

> While Richardson and Robertson told her to take breaks whenever she needed to
> express milk, this is not how they applied break time in practice.  Specifically,
> Richardson and Robertson both complained Hicks "would disappear at times".
> Robertson admits he did nothing to check to see if Hicks was pumping.  This
> "disappearance" to go pump was held against Hicks and used as a reason to re-
> assign her.  As a result, Hicks lost her investigator pay.

(Doc. 21, p. 82).  Although the application and enforceability of § 207(r) has not been widely

addressed, the United States District Court for the Eastern District of New York provides a well-

reasoned analysis of the statue in Lico v. TD Bank, ___ F.3d ___, 2015 WL 3467159 (E.D.N.Y.

June 1, 2015).  In Lico, the plaintiff asserts that she was not allowed a private room to express

breast milk and when she asked to take a break for the purpose of expressing breast milk, she

often was not permitted to do so.  2015 WL 3467159, *1.  The plaintiff asserted that, because she

was not allowed to take breaks during the work day, she began arriving late to work, leaving

work early, and leaving work during the workday to nurse her child at home.  Id.  The plaintiff,

therefore, missed work time and ultimately was terminated based on attendance.  Id.  The

defendants in Lico argued that § 207(r) was not privately enforceable.  The court found,

however, that "[t]he entitlement to a private right of action could not be more clearly stated in the

provision.  At the same time, however, § 216(b) limits the remedies available for violations of

§ 207(r), in that it only permits recovery of lost wages and overtime, liquidated damages,

attorneys' fees, and costs."  Id. at *3.

The Lico court did note, as the court discussed above, that "there does not appear to be a

manner of enforcing the express breast milk provisions."  Id., quoting Salz v. Casey's Marketing

<u>Co.</u>, No. 11-CV-3055, 2012 WL 2952998 (N.D. Iowa July 19, 2012).  Although the <u>Lico</u> court

acknowledges that damages in a private suit under § 207(r) are limited to lost wages, it does set

out some plausible instances in which a private suit may result in the plaintiff's entitlement to

damages.

> [C]laims of discomfort or embarrassment caused by the inability to take a
> required nursing break are not compensable under the statute.  Additionally, the
> statute does not permit injunctive relief.  However, if an employee needed to take
> longer breaks in order to travel to appropriate areas to take a nursing break, and
> was docked pay as a result, those lost wages would be compensable in a private
> lawsuit.
>
> . . .
>
> The court reviewed the Amended Complaint, and concludes that plaintiff has
> plausibly alleged damages that are legally cognizable.  In several sections of the
> Amended Complaint, plaintiff alleges that she missed time at work because she
> needed to travel home in order to express milk.  At oral argument, plaintiff
> elaborated upon these allegations, and provided the Court with a copy of the
> plaintiff's initial disclosures, which specifically seek compensation for 40.35
> hours of wages lost "specifically because of Defendants' failure to comply with
> 29 U.S.C. 207(r) and discriminatory practices."  Based upon the allegations in the
> amended complaint, the Court concludes that plaintiff has plausibly alleged a
> claim of compensable damages, consistent with the remedies permitted under
> § 216(b).

<u>Lico</u>, ___ F.3d ___, 2015 WL 3467159, *3-4.

The plaintiff in the instant case alleges calculable lost compensation that resulted from

exercising her rights under § 207(r).  The plaintiff alleges that, because the time she took to

express breast milk was used to support her reassignment, she was demoted as a result of her

decision to breastfeed her child, and, due to the demotion, she lost investigator pay.  Even if this

is true, her lost investigator pay is not the same as "unpaid minimum wages, or [ ] unpaid

overtime compensation," which are the only forms of pay compensable under the statute.  The

statute does not provide for a remedy for "lost wages," but only for "unpaid minimum wages, or [ ] unpaid overtime compensation."  Plaintiff has not alleged that she suffered a loss in the form of "unpaid minimum wages" or "unpaid overtime compensation."  Moreover, it does not appear that the statute prohibits or provides a remedy for an allegedly wrongful termination related to breastfeeding; rather, by its express terms, it remedies only the employer's failure to provide unpaid break time for breastfeeding during actual employment.[14]  Accordingly, because plaintiff has not shown a genuine issue of fact regarding a compensable loss under the FLSA, the defendant's motion for summary judgment is due to be granted as to that claim.

## DISCRIMINATORY CONSTRUCTIVE DISCHARGE

Finally, in Count VII[15] of her Complaint, the plaintiff alleges that she was constructively discharged from her position.  The plaintiff argues that "[t]he Defendant created an environment that was so hostile toward the plaintiff due to the birth of her baby and due to the fact that she was breastfeeding her baby, the Plaintiff was constructively discharged."  (Doc. 1, p. 26).  An employee alleging constructive discharge must show that her working conditions were so "intolerable that a reasonable person" would have felt "forced into involuntary resignation."

---

[14]  The court acknowledges the absurdity of this conclusion.  An employer faced with a request to allow an employee to take breaks to breastfeed may simply fire the employee rather than attempt to accommodate the request for breaks.  Nevertheless, the language in § 207(r)(1) and § 216(b) is clear.  Break time and a nursing room are all that is required under the FLSA, and even if those are denied, the only remedy is for unpaid minimum wage or overtime pay.  Of course, protection against such a termination may be found under the Pregnancy Discrimination Act, as discussed above, which provides a much broader and more robust remedy.

[15]  The plaintiff's Constructive Discharge claim is designated as Count VI in the Complaint.  However, this appears to be a typographical error.  Accordingly, the claim will be designated as Count VII for purposes of this Order.

Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 65 (5th Cir. 1980)[16]; see also Thomas v. Dillard Dept. Stores, Inc., 116 F.3d 1432, 1433-34 (11th Cir. 1997); Mitchell v. Pope, 189 Fed. Appx. 911, 915 (11th Cir. 2006).   The appellate court has denied claims based on allegations of constructive discharge where the employee assumed that she would be fired, noting that "part of an employee's obligation to be reasonable is an obligation not to assume the worst and not to jump to conclusions too fast."  Foshee v. Ascension Health-IS, Inc., 384 Fed. Appx. 890, 892 (11th Cir. 2010), quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987).

The plaintiff supports her claim of constructive discharge by asserting several events that occurred after she returned from leave.  The plaintiff claims she was written up twice and given a less favorable evaluation on the day she returned from leave.  She asserts that her pharmacy diversion cases were taken from her.  The plaintiff was reassigned from WANS to patrol for what were, according to the plaintiff, trumped-up reasons.  Her reassignment to patrol resulted in decreased pay and she no longer was guaranteed not to have to work weekends, interfering with her ability to obtain child care.  The plaintiff was asked to breastfeed in the locker room while she still was assigned to WANS, and she was interrupted each time she tried to do so.  After she was transferred to patrol, the plaintiff was told that her breastfeeding was going to be accommodated by giving her the patrol beat near City Hall so that she could use lactation rooms there when she needed to express milk.  However, because of the way patrol officers are required to request breaks and because patrol officers cannot take breaks while on an active scene, the plaintiff had no guarantee that she actually would be able to take breaks when needed to express milk.  Furthermore, when the plaintiff expressed fear that wearing a protective vest would

---

[16]   In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

interfere with milk production or cause infection – a concern with which her doctor agreed and sent a note to the TPD about – she was given the alternatives of not wearing a vest or wearing a "larger" vest.  The plaintiff felt that either of these options put her safety and life at risk.  Other officers testified that they wore safety vests every day on patrol and that an improperly fitted vest would not cover the vital organs and, therefore, would not serve the purpose for which it was intended.  The plaintiff felt that she was being asked to choose between breastfeeding her child and protecting herself by wearing a properly fitted safety vest.  She claims that this issue, especially, made her work environment so intolerable that she felt she had no choice but to tender her resignation.

The defendant argues that the events leading up to the plaintiff's reassignment to patrol are not sufficient to support a claim of constructive discharge.  This may be correct, but the situation the plaintiff faced if she began work as a patrol officer is, in itself, sufficient to support a claim of constructive discharge.  The defendant argues that her reassignment to patrol was based on performance issues and that "[t]he issues regarding the use of a vest have been fully addressed" and "were not the City's fault."  (Doc. 33, p. 12).   The defendants further state that wearing a vest is "simply part of law enforcement," and that "[o]thers had worn vests under identical circumstances without any problems."  Id.  Finally, the defendant asserts that the plaintiff has not put forth evidence to show that the defendant failed to afford break time to patrol officers.  Accordingly, the defendant asserts that the plaintiff's resignation was voluntary, not the result of coercion, duress, or fraud, and cannot be classified as a constructive discharge.

The defendant's argument, however, does not overcome the issues of material fact that are presented.  Although it is quite true that it is not the "City's fault" that wearing a safety vest is a necessary part of being a patrol officer and that such vests can impede milk production and

cause infection in lactating women, that is not a sufficient argument to overcome the plaintiff's allegations.  The plaintiff asserts that, after being transferred to patrol, she asked for a job at the desk – which is staffed 24-hours a day – while she was breastfeeding.  The plaintiff asserts that other female officers who were breastfeeding were put on the desk for the duration of their breastfeeding.  Furthermore, the plaintiff claims that she does not know of any female officer who has worn a vest while breastfeeding.  Accordingly, the defendant's argument that other officers had done it is a fact dispute to be put before a jury.  Even if the defendant's argument is correct, the fact that one officer could wear a safety vest during a full shift and had no problems breastfeeding does not mean that the plaintiff and her doctor's concerns were illegitimate.

Finally, the defendant's argument that the plaintiff did not provide evidence that the TPD had failed to provide adequate break times to lactating officers does not overcome the plaintiff's assertion that she reasonably feared she would not be allowed adequate breaks.  The plaintiff has put forth the general procedure for requesting a break as a patrol officer.  The officer must call dispatch, be put on the break list, and cannot go on break until cleared by dispatch.  Furthermore, a patrol officer may not go on break while on an active scene – which may be the duration of that officer's shift or longer.  These allegations support the logical inference that the plaintiff would not be able simply to go to City Hall and take a break to express milk whenever she had the need, perhaps as often as two or three times a shift.  The fact that she does not provide evidence that an officer has had that specific problem in the past does not preclude the issue from going before a jury.  The plaintiff was placed in a position where she felt that she had to choose between breastfeeding her child and protecting herself on the job.

In the Motion for Summary Judgment, the defendant argues that "[e]stablishing a constructive discharge claim is a more onerous task than establishing a hostile work environment

claim," and seems to insinuate that the plaintiff must prevail on her hostile work environment claim to have a chance at prevailing on her constructive discharge claim.  Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009).  However, Bryant does not support the idea that in order to bring a successful constructive discharge claim, the plaintiff *must* bring a successful hostile work environment claim.   In Bryant the plaintiffs' claims of hostile work environment and constructive discharge were based on the same facts.  575 F.3d at 1297-98.  The plaintiff in Bryant alleged harassing behavior that persisted over a long period of time, and the Eleventh Circuit determined that this behavior made the plaintiff's work environment hostile and ultimately forced her to resign.  It is not implied or stated, however, that this is the only way to prove constructive discharge.   In the instant case, the issue that made the plaintiff's work environment hostile was her inability to work safely under the limitations imposed by the TPD. She was forced to choose between breastfeeding her child and working without fear for her safety due to forgoing a bullet-proof vest or using an ill-fitting one.  All of the testimony in this case acknowledged that it so dangerous for a patrol officer to work without a vest that no one knew of an officer who did so.  The TPD's suggestion that plaintiff patrol without a vest or, almost as bad, with an ill-fitting vest exposed the plaintiff to a life-and-death risk that other patrol officers were not required to face simply because she wanted to breastfeed her child.  The facts of this case present the unique danger that police officers face, and when the employer forces the officer to choose between breastfeeding and her own safety, a reasonable person may feel compelled to resign.

Accordingly, the plaintiff's claim for constructive discharge can survive despite the fact that her claim for hostile work environment does not.  The defendant's motion for summary judgment is due to be denied with regard to the plaintiff's claim of constructive discharge.

**CONCLUSION**

For the reasons set forth herein, the defendant's Motion for Summary Judgment is GRANTED as to plaintiff's claims under Title VII of hostile work environment and disparate treatment (Counts II and III) and deprivation of rights under the FLSA (Count V). The Motion for Summary Judgment is DENIED as to the plaintiff's claim of pregnancy discrimination under Title VII (Count IV), interference and retaliation under the FMLA (Counts I and IV), and constructive discharge (Count VII).

A separate order will be entered.

DATED this 19th day of October, 2015.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE